**Bruce McCAFFERTY, Appellant,**

v.

**Walter LEAPLEY, Warden, South Dakota State Penitentiary, and Roger Tellinghuisen, Attorney General of the State of South Dakota, Appellees.**

No. 90–5594.

United States Court of Appeals, Eighth Circuit.

Submitted June 12, 1991.

Decided Sept. 17, 1991.

Rehearing and Rehearing En Banc Denied Oct. 22, 1991.

Timothy M. Gebhart, Sioux Falls, S.D., for appellant.

Wade A. Hubbard, Pierre, S.D., for appellees.

Before ARNOLD and MAGILL, Circuit Judges, and LARSON,* Senior District Judge.

* The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

LARSON, Senior District Judge.

Defendant Bruce McCafferty appeals from the district court's [1] dismissal of his petition for a writ of habeas corpus. McCafferty was convicted of knowingly engaging in sexual contact with a child under fifteen years of age, in violation of South Dakota Codified Laws § 22–22–7. The conviction stemmed from an investigation which began when a kindergarten teacher observed a hickey on S.F., the daughter of the woman that the defendant was living with at the time. When the teacher asked S.F. what had happened to her neck, the girl, who called the defendant her "daddy," replied, "[m]y daddy sucked on it."

Further questioning by S.F.'s special education teacher elicited responses from S.F. that revealed an unusual level of knowledge about sexual matters. S.F.'s responses also further implicated defendant in these activities. Because of the nature of S.F.'s responses, school officials contacted police and requested that a psychologist talk to S.F. In response to their request, Dr. Mary Curran, a clinical psychologist and Director of Psychological Services in Clinical Training for Catholic Family Services, came to S.F.'s school on May 3, 1983. S.F. recognized Dr. Curran,[2] and came running up across the playground to meet her. Based on the interview with S.F. that day, Dr. Curran believed that the defendant had engaged in various sexual behaviors with S.F.

The defendant was interviewed by police the same day S.F. saw Dr. Curran. After being informed of his rights and questioned for a short time, the defendant composed his own written statement and signed it. In the statement, the defendant indicated that he had a "fatherly" relationship with S.F. Defendant stated that when he saw the hickey on S.F.'s neck, he assumed it had resulted from a "nip" he had given her when they were playing a game. In describing his "nightly routine" of tucking S.F. into bed, defendant stated:

> In [S.F.'s] room, I give her a kiss, she then arches her back and says, "Here is your tush," I give her bottom a pinch and then leave, turning off the light. On this nightly routine I may have inserted my finger into her vagina while pinching her bottom but I declare I have never done so knowingly.

S.F. was unable to testify meaningfully at trial, and the district court allowed her special education teacher and Dr. Curran to testify concerning what S.F. had told them. Defendant argues this testimony violated his sixth amendment right to confront the witnesses against him. Defendant further claims his right to due process was violated when (1) the court allowed testimony which defendant claims amounted to a "stamp of believability" on S.F.'s statements; (2) the court allowed the prosecutor to ask, in cross-examination, whether the defendant had ever been convicted of a felony; and (3) the court refused defendant's request for a court-appointed psychiatrist to examine S.F. for the defense.

## I.

Prior to trial, defendant moved to exclude as hearsay all statements S.F. had made to others concerning the alleged abuse. The trial court denied the motion, and the first witness in defendant's trial was S.F.'s mother, Debby. Debby testified that S.F. became very close to the defendant after he moved into her home in 1982 and called him "daddy." Debby testified that S.F. told her that her daddy had sucked her on the neck and was involved in other "touching" incidents, but the prosecutor did not ask Debby to describe any of these incidents.

S.F. was called to the stand next. She had been questioned by counsel and the court in chambers for purposes of determining her competency to testify, and the

1. The Honorable John B. Jones, United States District Judge for the District of South Dakota.

2. S.F.'s mother was convicted of child neglect in connection with the death of one of her children and had been counseled by Dr. Curran while in the Women's Correctional Facility. Dr. Curran met with S.F. and her brother when they came to the prison for family get-togethers and subsequently saw S.F. several times after S.F.'s mother was released from prison.

court had ruled she was a competent witness who understood the difference between telling the truth and telling a lie. S.F. was unable to respond to many of counsel's preliminary questions, however, and was excused before any questions regarding the alleged abuse were asked.[3]

Elizabeth Zeplin, S.F.'s kindergarten teacher, told the jury how she had noticed a mark on S.F.'s neck when S.F. came into her classroom on the morning of May 2, 1983. When Zeplin asked S.F. what happened to her neck, S.F. said, "My daddy sucked on it." Zeplin did not talk with S.F. further about the mark, because the bell had rung and the room was full of children. Zeplin, who had been a teacher for thirty-nine years, described S.F. as someone who often needed extra help, who would become confused and upset when she was confronted with a subject or task she had trouble comprehending.

S.F.'s preschool teacher, Pam Haugland, spoke with S.F. in more detail about the defendant's actions. Haugland testified that she had known S.F. since 1980, when S.F. began to attend Haugland's preschool program for developmentally disabled children. When S.F. began kindergarten in the fall of 1982, she would attend kindergarten class in the morning and then go to preschool classes with Haugland in the afternoon. S.F.'s kindergarten teacher had spoken with Haugland at noon about the hickey on S.F.'s neck, and Haugland testified she "was asked to see, to go a little further and see what the mark on her neck was. To see if [S.F.] would open up and tell me anything more."

Haugland then testified about her conversation with S.F. She indicated that she took S.F. on her lap in her classroom that afternoon,

And I said, "how did you get that on your neck?" And she said, "Well, my daddy sucked me there." And I said, "Show me." And she showed me on "me."

Haugland then took some ordinary dolls she had in her playroom and S.F. demonstrated the same behavior with the dolls. After they played some more with the dolls, S.F. responded to Haugland's question, "[s]how me where you touch daddy and where daddy touches you," by demonstrating lots of long hugs and long kisses over all parts of the dolls' bodies. During this time, Haugland testified, "she was just talking and she put the [S.F.] doll on the daddy doll and told me this is how she could sit on her daddy's weenie." When Haugland inquired further about whether her daddy "ever put anything in her," S.F. said "no," and Haugland accepted this statement without further questioning.

Dr. Curran's testimony began with a brief description of her first contact with S.F., when S.F.'s mother was in prison. She then described how S.F. ran to meet her on the playground on May 3, 1983, and asked about the bird S.F. had seen on one of her visits to Dr. Curran's office. Once alone in the classroom with S.F., Dr. Curran began to tape record their conversation. After some preliminary discussion and play with Dr. Curran's dolls,[4] Dr. Curran testified that she asked S.F. about the

3. The evidence reflected that although S.F. was seven years old at the time of trial, she was developmentally immature. Dr. Curran, who had been sequestered and so had not actually observed S.F. on the stand, gave her opinion as to S.F.'s ability to testify meaningfully as follows:

Q: Have you ever seen how [S.F.] reacts or behaves in a stressful situation, such as coming into the courtroom today?
A: Well, I saw her before she came in. She had visited, I think with the Judge, and had agreed to come in and talk in here. And Debby asked me to come in and be with [S.F.] for a minute, and she just burst into tears and threw her arms around me. And so I don't,

you know, it was stressful for her. And she was really confused about what to do when she came in here. And I think she was real anxious about that.

\* \* \* \* \* \*

Q: In your opinion would she have difficulty in relating to the questions that might be asked of her?
A: I think if you asked the questions, yes she would.... if you didn't know her before— takes [S.F.] a little while to kind of get attached to anybody and feel confident. I guess I'd be surprised if she'd talk in here.

4. There were four anatomically correct dolls: a man, a woman, a girl, and a boy.

hickey on her neck. In response to the question, "Where did that come from?," S.F. replied, "Daddy bit it," and later "Daddy sucked it." S.F. then talked further about "playing house and kisses, you know, that she and daddy plays [sic] house and daddy kisses her. And ... I said, 'Where does he kiss you?' and she said, 'First you kiss bodies and then you kiss butts.'" After providing additional details of their conversation, including S.F.'s demonstration of sexual intercourse, Dr. Curran indicated that S.F. "had an extra-ordinary understanding of sexual things that ordinary seven year olds do not."

On cross-examination, Dr. Curran agreed that some of S.F.'s advanced knowledge of sexual matters came from observation, although she maintained this observation was "in addition to some of the initial foreplay kinds of things that I believe took place" between S.F. and the defendant. Dr. Curran also stated that the defendant had in some ways been a positive influence in S.F.'s life, and she acknowledged several of the specific questions and answers which defense counsel cited based on his review of the tape recording of her May 3 interview.

Defense counsel called two witnesses at trial. Dr. Carroll Isburg, a pediatrician who had examined S.F. on May 6, 1983, testified that although S.F.'s genital area was sore, his examination was inconclusive regarding whether the child had been abused.[5] Defendant also testified. He described his relationship with Debby and her children, gave three examples of specific instances where he had "caught [S.F.] in a lie,"[6] and denied that he had ever engaged in behavior of a sexual nature with S.F. On cross-examination, he admitted that

S.F. was not lying when she said that he had sucked her neck, but he continued to maintain that this was done as part of a game. Defendant also admitted that he gave S.F. extended kisses on the lips, a practice he did not regard as unnatural. Defendant flatly denied engaging in other sexual behaviors, however, stating that "[S.F.] has fabricated my participation in sexual contact with her."

The jury found the defendant guilty. Defendant filed a motion for a new trial alleging, *inter alia*, that the admission of S.F.'s hearsay statements was error and violated his constitutional right to confront the witnesses against him. The trial court denied defendant's motion. On appeal, the South Dakota Supreme Court held that S.F.'s statements to her special education teacher, Pam Haugland, and to Dr. Curran could be properly admitted under South Dakota's residual exception to the hearsay rule. *State v. McCafferty*, 356 N.W.2d 159, 161–62 (S.D.1984). The court determined, however, that a remand was necessary to examine more specifically whether the statements had sufficient "indicia of reliability" to afford the trier of fact a satisfactory basis for evaluating their truth. *Id.* at 163, 165.

A. Reliability of S.F.'s Hearsay Statements

■ On remand, the trial court conducted an evidentiary hearing. Both Dr. Curran and Pam Haugland again testified. Haugland stated that prior to her conversation with S.F. about the hickey on her neck, she had been concerned about some of S.F.'s behavior, which she had been unable to explain. Haugland testified

---

5. Dr. Isburg did not ask S.F. why her genital area was sore. He indicated in response to the prosecutor's examination that while he observed no abrasions or stretch marks in S.F.'s genital area, enough time had gone by that such evidence "could have been gone by the time I examined her."

There is often no physical evidence of child sexual abuse, because many abusive acts, such as fondling and kissing, leave no marks, and because the healing of any injuries in the genital area "may be complete and rapid, so that no

physical evidence remains when the child comes to the medical examination." J. Myers, J. Bays, J. Becker, L. Berliner, D. Corwin, & K. Saywitz, "Expert Testimony in Child Sexual Abuse Litigation," 68 Neb.L.Rev. 1, 37 (1989).

6. Defendant claimed one of these incidents included S.F.'s statement to school officials that her mother was sleeping with the defendant and another man at the same time, which was untrue. Neither of S.F.'s teachers could recall any such statement by S.F., however.

I guess you have to go back and know [S.F.] a little bit. She came into the classroom, into the program a year and a half before that with a lot of, oh, [S.F.] was very insecure, cried easily. Had gone through a lot of things happening. And we had built up a lot of trust and a lot of confidence, and she made a lot of progress in using correct language. She had before this time had done a lot of baby talking. A year and a half before had cried easily. Those kind of behaviors. And she had made significant progress in these areas and was not doing a lot of these kind of things. And towards this incident I had noticed, I did notice crying more easily, kind of a spacey blank off, blank looking off look a lot. Tired. A little more pale looking. But I did not pinpoint a reason as to why.

After describing again her conversation with S.F. on May 3, 1983, Haugland indicated that S.F. did not appear upset or concerned when she talked with her. Haugland testified, "I felt at the time that she was telling me the truth." In cross-examination, Haugland admitted that she was not a specialist in sexual abuse matters, but stated that based her conversation with S.F., "I saw red flags. Something was wrong. And at that point [I] called in someone to help."

Dr. Curran also described again her contacts with S.F., both prior to and after being called in to assess whether S.F. had been sexually abused. Dr. Curran reiterated her view that S.F.'s sexual knowledge was extremely precocious and explicit, particularly in light of her immaturity in other areas of learning. Dr. Curran testified that in her view, it was not possible for S.F. to have made up the information she had conveyed to Dr. Curran during the interview on May 3, because "[s]he was too accurate." Dr. Curran testified that S.F. was "extremely believable," and noted that she "basically maintained her statement" even after her mother had "in a sense dumped the fact that … if you don't tell that this didn't happen then mommy and [the defendant] can't get married and then

you won't have a daddy." In cross-examination, Dr. Curran maintained that her objectivity was in no way affected by her prior relationship with S.F. According to Dr. Curran, her prior relationship "made [S.F.] more comfortable and made it more likely that she would communicate to me what actually happened, because we had a good relationship and she felt comfortable."

Defendant's first witness at the remand hearing was an individual who testified that S.F. had seen him having sexual intercourse with her mother in the summer of 1982.[7] Next, defense counsel presented expert testimony by Dr. Franklin Johnson, a staff psychiatrist at the South Dakota Human Services Center. Dr. Johnson testified that, in his opinion, a specialist who had not had a prior relationship with S.F. should have evaluated her to eliminate the potential for bias and distortion of the results. Dr. Johnson appeared to agree, however, that because of the degree of explicit detail in S.F.'s statements, it was unlikely that S.F. would be able to fabricate the experiences she had described to Dr. Curran. He thought the examination should have "gone farther" though, to indicate "whether this happened potentially with someone else."

Referring the court to S.F.'s mother's testimony at trial, including her statement that S.F. had been caught lying on "[q]uite a few" occasions, defense counsel's final submission at the remand hearing was a transcript of a taped conversation he had had with S.F. on June 6, 1983. In this conversation, S.F. told counsel that her daddy would "bite on my tush" when he put her to bed. She also explained how her daddy gave her the mark on her neck that her kindergarten teacher saw: "He sucked on it a little bit and bite [sic] it a little bit." After counsel told S.F. that he was trying to "help to get your dad out of jail … [b]ecause I like your dad too" and so he wanted S.F. to tell the truth, S.F. denied that the defendant ever touched her vagi-

7. This testimony is consistent with Dr. Curran's opinion that S.F. had not engaged in sexual intercourse with the defendant, but had observed it being performed by others.

nal area with his penis or with his finger. She remembered telling Dr. Curran that he had done those things, however, and said to counsel, "I don't want to tell you."

After consideration of all the evidence referred to by the parties,[8] the court concluded that S.F.'s statements to Dr. Curran and Pam Haugland were sufficiently reliable that the statements were properly admitted at trial and did not violate defendant's confrontation clause rights. Defendant's appeal from this order was summarily rejected by the South Dakota Supreme Court. *State v. McCafferty*, 384 N.W.2d 323 (S.D.), *cert. denied*, 476 U.S. 1172, 106 S.Ct. 2897, 90 L.Ed.2d 983 (1986). In his petition for a writ of habeas corpus, defendant argues again that he has been denied his constitutional right to confront the witnesses against him. Citing *Idaho v. Wright*, —— U.S. ——, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), the district court disagreed, holding that S.F.'s statements had the "particularized guarantees of trustworthiness" required to satisfy the defendant's rights under the sixth amendment.

Defendant argues on appeal that although the district court cited the factors discussed by the Supreme Court in *Wright*, the court misapplied the law to the facts of this case. Defendant further argues that, like the state courts, the district court erroneously equated the test of reliability for confrontation clause purposes with the test for admissibility under the state's residual exception to the rule excluding hearsay.

We cannot agree. While the state courts may have equated the issue of reliability for confrontation clause purposes with the issue of admissibility for purposes of the state's hearsay rule, the federal district court clearly recognized that *Wright* requires "particularized guarantees of trustworthiness" beyond that imposed by state rules of evidence. *See Idaho v. Wright*, 110 S.Ct. at 3146–48. As instructed by *Wright*, the district court in this case turned to an evaluation of the circum-

stances surrounding S.F.'s out-of-court statements for purposes of determining whether S.F. was likely to be telling the truth when the statements were made. *Id.* at 3149–50.

Our review of these circumstances, based on the state court's factual findings and our own review of the evidence, convinces us that the defendant's sixth amendment rights were not violated by the admission of S.F.'s hearsay statements. We consider first the circumstances surrounding S.F.'s statements to Pam Haugland. Haugland had worked with S.F. for two and a half years on an individualized basis and had developed a good relationship with S.F. Prior to May 2, 1983, Haugland had never discussed sexual matters with S.F. and had no reason to supply a "story" for S.F. with regard to these matters. S.F.'s statements to Haugland about how her "daddy" sucked on her neck were given spontaneously in response to a nonleading question about how she got the mark on her neck. Her statements about this were consistent with what she told others and with what she demonstrated on Haugland's own neck and with Haugland's playroom dolls. Although Haugland termed one doll the "[S.F.]" doll and one doll the "daddy" doll after S.F. had identified her "daddy" as the source of the hickey, it was S.F. who volunteered in play statements such as "this is how she could sit on her daddy's weenie" [S.F.'s term].

S.F.'s statements to Dr. Curran were also explicit and consistent. She described getting the hickey and the long kisses and hugs from her "daddy" in language very similar to what she had used to describe these things to Haugland. S.F.'s response to Dr. Curran when she saw her on the playground was a positive one, and although Dr. Curran knew she was being asked to evaluate S.F. for suspected sexual abuse and brought anatomically correct dolls for that purpose, it was S.F. who

---

**8.** The court indicated at the close of the remand hearing that it would listen to the tape of Dr. Curran's May 3, 1983, interview with S.F. if counsel would provide it. It appears, however, that the tape could not be located at the time of

the remand hearing. Defense counsel had been provided with the tape prior to trial and questioned Dr. Curran at the remand hearing based on this prior knowledge.

recognized "very early" that the male doll had a "wiener," that her daddy had one, and that "[y]ou touch it." Her knowledge and description of other sexual activities was exceptionally advanced for a girl of S.F.'s age and developmental level. While she described "mommy" doing some of the activities and used Dr. Curran's adult female doll to illustrate, she used the little girl doll to illustrate other behaviors with the adult male doll.

Unlike the pediatrician in *Wright*, Dr. Curran's interview was tape recorded and was available to the defendant prior to trial. Defendant's expert was critical of Dr. Curran's evaluation because of her prior relationship with S.F., but he nonetheless agreed S.F.'s statements were such that it was unlikely that she would be capable of fabricating them. Defendant's expert also appeared to criticize Dr. Curran for not going further to determine whether someone other than the defendant was the perpetrator, but this was *not* defendant's position either at trial or during the remand hearing: defendant claimed that S.F. had fabricated the fact that certain things had happened to her, not that she was misidentifying him as the perpetrator.

As the district court found, however, S.F. had no motive to falsely accuse the defendant of sexual abuse. S.F. felt affection for the defendant and, as defense counsel brought out at trial, for the first time there was some stability in S.F.'s family life. We agree with the district court's assessment that there would appear to be every motive for S.F. *not* to reveal anything that would jeopardize the defendant's position in her family and certainly no motive for S.F. to create these allegations. Even after S.F.'s mother had urged her to recant, S.F.'s statements remained basically consistent.[9] These findings together support the conclusion that "particularized guarantees of trustworthiness" exist to support the admission of the statements S.F. made to her special education teacher and to Dr. Curran

regarding the alleged abuse. *See Myatt v. Hannigan*, 910 F.2d 680 (10th Cir.1990); *State v. Lanam*, 459 N.W.2d 656, 661–62 (Minn.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 693, 112 L.Ed.2d 684 (1991). Under the totality of the circumstances we find S.F. was particularly likely to be telling the truth at the time the declarations to Dr. Curran and Pam Haugland were made. *Wright*, 110 S.Ct. at 3152. *See generally* J. Myers, Child Witness Law and Practice § 5.37A at 207–14 (1991 Supp.).

### B. Due Process Considerations

■ Defendant also argues that certain statements by Haugland and Dr. Curran so tainted the trial that his right to due process was violated. "As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice." *Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941). More than a finding of trial error or even of plain error is required to justify habeas relief on the basis of an evidentiary ruling. *Redding v. State of Minnesota*, 881 F.2d 575, 579 (8th Cir.1989), *cert. denied*, 493 U.S. 1089, 110 S.Ct. 1158, 107 L.Ed.2d 1061 (1990). An evidentiary error violates a defendant's due process rights only when the error complained of is so gross, conspicuously prejudicial, or otherwise of such magnitude that it fatally infects the trial. *Id.; Rainer v. Department of Corrections*, 914 F.2d 1067, 1072 (8th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 993, 112 L.Ed.2d 1077 (1991). *See Hulsey v. Sargent*, 821 F.2d 469, 472 (8th Cir.), *cert. denied*, 484 U.S. 930, 108 S.Ct. 299, 98 L.Ed.2d 258 (1987).

■ Defendant claims that two statements by Haugland and two statements by Dr. Curran, which defendant did not object to at trial, were so prejudicial that their admission rendered his trial fundamentally unfair. The statements all relate in some

---

**9.** The only exception is the taped interview with defense counsel. We agree with the district court's conclusion that this interview alone does not render unreliable S.F.'s statements to Dr. Curran and Pam Haugland. In many respects

S.F.'s statements to counsel are consistent with what she told her teacher and Dr. Curran. It is only after counsel explains how he wants to help her daddy, who he knows she likes a lot, that inconsistencies begin to occur.

way to S.F.'s credibility. The first statement by Haugland was made at the beginning of her testimony, after Haugland had indicated that she had worked with S.F. for two and a half years and had established some rapport with S.F. In response to the question, "Did you feel that you could rely on what she told you or believe what she told you?," Haugland said, "Definitely." This question was asked after defense counsel had attacked S.F.'s credibility in cross-examination of her mother,[10] and the district court held it was proper rebuttal regarding Haugland's opinion of S.F.'s character for truthfulness. *See* Fed. R.Evid. 608.

Haugland's second statement was offered as she was describing her conversation with S.F. After S.F.'s demonstration of how she could "sit on [her] daddy's weenie," Haugland testified

> And I just at this point felt I better find out if there'd been any penetration, or anything of this nature. And I asked her if daddy ever put anything in her. And she was very honest, "No. Just kleenex." And I truly don't know what [S.F.] meant about that. Then she stopped talking pretty much about that. Very honest.

The district court observed that Haugland's "very honest" statements were isolated, spontaneous comments by a witness who was not considered an expert. The court concluded that the trial court's failure to strike these comments, when no objection had been made by defendant's counsel, did not render defendant's trial fundamentally unfair.

Dr. Curran's statements came at the end of her direct examination, after she had testified concerning statements S.F. had made about the alleged abuse. The prosecutor asked Dr. Curran

> Q: Have you ever had any trouble with [S.F.] in the past telling you things that were not true?
>
> A: No, I can't say that I have.

**10.** On cross-examination, defense counsel asked S.F.'s mother:

> Q: Did you ever have occasion, Debby, to catch [S.F.] in a lie?
>
> A: Yes I have.
>
> Q: On several occasions?
>
> A: Yah. Quite a few.

> Q: You think you can tell when kids are trying to pull the wool over your eyes?
>
> A: Not always. I think kids are pretty good. One area, you know, based on the psychological research, is that in areas of child sexual abuse, it would be less than one per cent of the population lie about that. And it would take a pretty sophisticated cognitive system to create that. And I don't think [S.F.] has that kind of system functioning yet that she could create that.

Defendant failed to object at trial to this testimony, and the district court concluded it was permissible because the first question related to S.F.'s character for truthfulness in the past and the second related to the general ability of children to tell the truth. Defendant argues the testimony went beyond general character for truthfulness and addressed the specific believability and truthfulness of S.F.'s statements regarding the abuse, testimony which this Court has held should be excluded under the Federal Rules of Evidence. *United States v. Azure*, 801 F.2d 336, 340–41 (8th Cir.1986). *See* J. Myers, J. Bays, J. Becker, L. Berliner, D. Corwin, & K. Saywitz, "Expert Testimony in Child Sexual Abuse Litigation," 68 Neb.L.Rev. 1, 121–25 (1989). Defendant maintains that Dr. Curran's testimony regarding the likelihood that children lie about sex abuse has been rejected by other courts as impermissibly supporting the alleged victim's statement that the abuse occurred. *See generally id.* at 127; J. Myers, Child Witness Law & Practice § 4.17G (1991 Supp.).

Our task in the context of a federal habeas corpus review is not, however, to correct alleged trial errors. Our task is to review the entire trial process to determine whether an alleged error of constitutional dimension fatally infected the trial. *Hulsey*, 821 F.2d at 472. Our review of the entire proceeding in this case, including both the trial and remand hearing transcripts and exhibits, convinces us that any error by the trial court in failing *sua sponte* to strike

portions of the testimony defendant now challenges is not so "gross" or "conspicuously prejudicial" that habeas relief is warranted. As the South Dakota Supreme Court has observed,[11] defendant's admissions establish that he caused the hickey on S.F.'s neck observed first-hand by her teachers and observed by the jury from the pictures of S.F. admitted into evidence. Defendant further admitted that he gave S.F. extended kisses on the lips, frequently pinched her bottom, and "may have" inserted his finger into her vagina during his nightly routine of putting S.F. to bed. The defendant cross-examined several witnesses about S.F.'s truthfulness and testified himself concerning specific incidents in which he allegedly had "caught [S.F.] in a lie." Neither Haugland nor Dr. Curran were asked directly whether they believed S.F. when she described the alleged abuse; their statements could only have inferentially placed the "stamp of believability" defendant complains of. Under these circumstances, we cannot say the statements so tainted defendant's trial that his right to due process was violated.

We reach the same conclusion with respect to defendant's other due process allegations. State law allows the prosecutor to cross-examine the defendant about his prior felony conviction, see State v. McCafferty, 356 N.W.2d at 165–66, and the court properly instructed the jury to consider the prior conviction solely in connection with evaluating the defendant's credibility. The state court made a specific finding on remand that the probative value of the defendant's prior conviction outweighed any prejudice, particularly in light of defense counsel's immediate redirect examination which established that the prior conviction was not related to any sex offense.[12] See McCafferty v. Solem, 449 N.W.2d 590, 595 (S.D.1989). This limited use of defendant's prior felony conviction does not render his trial fundamentally unfair. See Mercer v. Armontrout, 844 F.2d 582, 586–87 (8th Cir.1988); Wedemann v. Solem, 826 F.2d 766, 768 (8th Cir.1987); Fed.R.Evid. 609.

Finally, defendant contends the trial court's denial of his motion for a court-appointed psychiatrist to examine S.F. for the defense denied him due process. We note that the court made available to defendant all materials relating both to Dr. Curran's evaluation of S.F. and to Dr. Isburg's physical examination of her. We agree with the state court that defendant failed to make the showing necessary to justify a court-appointed psychiatrist. See McCafferty v. Solem, 449 N.W.2d at 594–95.

C. Conclusion

Defendant argues forcefully in his brief that the combination of errors he alleges on appeal and the nature of the testimony presented against him rendered his trial fundamentally unfair. We have considered defendant's allegations and do not find them persuasive based on the record before us. The admission of S.F.'s hearsay statements did not violate defendant's confrontation clause rights, and no error or combination of errors in the conduct of defendant's trial was so gross, conspicuously prejudicial, or of such a magnitude as to deny him due process of law. The district court's denial of defendant's petition for a writ of habeas corpus is affirmed.

11. The South Dakota Supreme Court agreed that based on the current state of the law regarding the admissibility of expert witness testimony in child sex abuse cases, the trial court erred in admitting statements regarding S.F.'s truthfulness and the truthfulness of children who make allegations of sexual abuse generally. McCafferty v. Solem, 449 N.W.2d 590, 593 (S.D.1989). The court nonetheless refused to reverse the defendant's conviction. Noting that the nature of appropriate expert testimony in child sex abuse cases was an evolving area of the law, the court held that defendant's conviction was fairly obtained under the evidentiary rules in place at the time of his trial. Id. at 594.

12. The prosecutor's last question to defendant on cross-examination was

Q: Have you ever been convicted of a felony before?
A: Yes I have.

Defense counsel's first question on redirect was

Q: Bruce, was that felony with relation to any sex offense?
A: No it was not.