**GOVERNMENT OF THE VIRGIN ISLANDS, Appellee**

**v.**

**EURIE JOSEPH, Appellant**

No. 91-3424

United States Court of Appeals

for the Third Circuit

June 1, 1992

THURSTON T. MCKELVIN (Acting Federal Public Defender); MELODY M. WALCOTT (Argued) (Assistant Federal Public Defender), Christiansted, St. Croix, V.I., *for appellant*

TERRY M. HALPERN (United States Attorney); DAVID L. ATKINSON (Argued) (Assistant United States Attorney), Christiansted, St. Croix, V.I., *for appellee*

## OPINION OF THE COURT

SLOVITER, *Chief Judge*

At issue in this ease is whether a second hearsay statement made by the victim of a homicide is admissible under the analysis of the Confrontation Clause set forth in Idaho v. Wright, 110 S. Ct. 3139 (1990).

### I.

### *Procedural Posture and Factual History*

On December 24, 1990, a five count information was filed charging Eurie Joseph with felony murder in violation of V.I. Code Ann. tit. 14, § 922(a)(2) (1964); premeditated murder in violation of V.I. Code Ann. tit. 14, § 922(a)(1) (1964); possession of an unlicensed firearm in a crime of violence in violation of V.I. Code Ann. tit. 14, § 2253 (1990 Supp.); assault with intent to commit murder, robbery and larceny in violation of V.I. Code Ann. tit. 14, § 295 (1964); and assault with a deadly weapon in violation of V.I. Code Ann. tit. 14, § 297 (1990 Supp.). Joseph entered a plea of not guilty.

Following a trial, the jury convicted him on count 1 of voluntary manslaughter (a lesser included offense of the felony murder and first degree murder charges), on count 3 of possession of an unlicensed firearm in a crime of violence, on count 4 of assault in the first degree, and on count 5 of assault in the third degree. The court sentenced Joseph to serve eight years on counts 1 and 4; five years on count 3 to run consecutive to the sentence imposed on counts 1 and 4; and five years probation on count 5 to commence upon release with credit for time served. Joseph appeals his conviction, claiming that the district court improperly admitted hearsay testimony which did not meet the requirements of either Fed. R. Evid. 804(b)(5) or the Confrontation Clause.

Following a conviction, we review the facts of record in the light most favorable to the government. United States v. Aguilar, 843 F.2d 155, 157 (3d Cir.), cert. denied, 488 U.S. 924 (1988). On November 20, 1990 during the mid-afternoon hours, two men entered the home of Ramon Castillo in Christiansted, St. Croix. Mr. Castillo's stepson, Francisco Mercado, was in the house at the time taking a

shower. Mercado testified that when he went upstairs to bathe, he saw only his stepfather through a partially opened bedroom door, did not hear any voices, and did not see anyone else in the house. As he showered, Mercado heard his stepfather call his name "in a desperate way." Mercado ran out of the shower, opened the door to his stepfather's bedroom, and found his stepfather on the floor with a gunshot wound to his chest.

Mercado testified that when he reached the bedroom door, he encountered a young man coming out of the bedroom into the hallway where Mercado stood. That man, whom Mercado later identified as Jose Rivera from a photo lineup, held a gun which was pointed directly at him and then fired. Mercado pushed Rivera's hand as he dodged out of the line of fire and thus was not injured. A second man followed the first so closely that Mercado was barely able to see him. Mercado did not identify the second man at trial.

Castillo's wife heard gunshots from the bar-restaurant that she operated below the apartment. She saw the backs of the two strangers as they were leaving but never identified them. She also testified that one of the men was carrying a gun, although she could not identify which one. She ran upstairs where she found her husband lying on the floor of their bedroom with a gunshot wound to his chest. When she found her husband, the bedroom was in disarray, although $500 in rent money which was secreted in the bedroom closet had not been removed. When Mrs. Castillo went to her husband, Castillo told her to "[l]ift my head, I'm dying." App. at 132.

As the two intruders left the house, they were seen by Jose Quinones, who had been fixing Castillo's car in the yard below at the time of the shooting. He saw the two men run from the apartment, down the front steps, and toward a gold-colored Sprint automobile parked directly behind the vehicle on which he was working. As the fleeing men approached after the shooting, Quinones tried to hide behind the Sprint, but one of the men approached him, pointed a .38 revolver at him, and told him to move out of the way. Thereafter the two men drove away. Quinones identified Joseph as the man who threatened him. Both Mercado and Quinones testified that both men they saw had guns with them.

Police were immediately summoned and arrived at the scene about seven minutes after the shooting. One of the first officers to respond was Sgt. Ramirez, who saw that Castillo was "in bad con-

dition." App. at 183. Nevertheless, Ramirez was able to take a brief statement from Castillo before the ambulance took him to the hospital.

Joseph concedes the admissibility of Castillo's November 20 statement as testified to by Ramirez as a dying declaration, and we thus include that portion of Ramirez's testimony verbatim:

> But I was looking more for h[im] to tell me, describe the guys them that been there or whoever did the crime.
>
> So he told me that he was upstairs and two guys came in and demanded money.
>
> I ask him to describe the guys for me. He said that one of the guys of them were cleancut, and his hair was short, and he were clean, and he had a big pendant on a chain. That the other guy was short and had locks, and he had his locks in a knot. The two of them were short.
>
> Q. Okay.
>
> Did he describe the[] relative complexions of the two individuals?
>
> A. Yes, he did.
>
> Q. Tell the jury about that, if you would, please.
>
> A. He said that one of them was a little more clear, and the clear skin guy's hair was short. That that guy had a pendant, a big pendant on a chain. That the other guy was short and he was more dark, and he had his hair in locks, but had it tied up in a knot.

App. at 185.

Because Castillo was "in bad shape", Ramirez did not ask Castillo additional questions at that time. Ramirez testified that in the past he had seen Joseph with a rope chain with a big pendant, that Joseph's complexion is clearer than Rivera's, and that Rivera is between 5'6" and 5'7", weighs about 120 to 125 pounds and is a "brown-skinned individual." Joseph testified that his height and weight are similar.

Virgin Islands police officer Hitesman testified that he photographed the crime scene and recovered physical evidence. He found a spent projectile on the hallway floor outside of Castillo's bedroom and a shell casing just inside the bedroom. He observed and photographed a bullet hole in the same hallway near the projectile and shell casing. Hitesman also inspected and photographed

the doorway to Castillo's bedroom and found no bullet holes. There was testimony from an expert in the field of firearms examination that the bullet that caused Castillo's death was .38 caliber and had been fired from a revolver. He further testified that the shell casing found in the hallway was a 9 millimeter shot from a semiautomatic pistol, and that the bullet in the hallway was 9 millimeter. Both the expert and Hitesman testified that these two bullets could not have been fired from the same gun.

On November 29, 1990, Ramirez returned to the hospital to interview Castillo.[1] Castillo, while paralyzed, was no longer in critical condition and had recovered sufficiently for Ramirez to interview him. It is the admissibility of this November 29 statement that is the subject of this appeal. We describe Ramirez's testimony verbatim:

MR. ATKINSON: Okay.

Q. The specific question, Sergeant Ramirez, is this: Did you talk with Mr. Castillo about what had happened to him on the 20th?

A. Yes, I did.

Q. Did he indicate to you what had happened?

A. Yes, sir.

Q. Did he indicate whether or not he had been shot by one of the two individuals that he had described to you earlier?

A. Yes, sir.

Q. Which of the two individuals did he say had shot him?

A. He stated the clear-skinned individual shot him.

Q. Did he say what immediately preceded him being shot by the clear-skinned individual?

A. Yeah. He said that he had just—he had just came from buying some parts to fix his car. He was upstairs, he was going to change his clothes to go work on his car when the two individuals came in the house, demanded the money. He told them he only had $30. He said that the clear-skinned guy, individual,

---

[1] At approximately 9:20 p.m. on November 20, Ramirez went to the hospital while Castillo was still in the emergency room and showed Castillo a photo lineup. The prosecution sought to introduce as a dying declaration Ramirez's testimony that Castillo, who was unable to speak at that time, pointed to Joseph as one of the two individuals responsible for the shooting. The court rules the testimony inadmissible.

hit him with a gun butt on his head, right, and then he shot him, and then he fell down.

Q. Did he indicate whether he was able to see whether the darker-skinned individual took a shot at somebody else?

A. Yeah.

He said that when they were leaving, he started to call for his stepson, and he saw that when they were leaving, the darker guy, the guy with the locks fired a shot at his stepson.

Q. As he was telling you about this, were you able to see any small abrasions or bumps or contusions to his head?

A. Yes, he had a laceration to his head.

Q. Did he indicate to you whether he knew either of these assailants?

A. He said he ain't know any one of them.

App. at 189-91.

On December 5, 1990, Castillo unexpectedly died as a result of his wounds, and thus was unable to testify at trial. Castillo's statement of November 20 was admitted without objection as a dying declaration. Joseph objected to the admission of the November 29 statement but the district court admitted it under the residual hearsay exception of Fed. R. Evid. 804(b)(5).

## II.

### Discussion

Joseph argues that it was prejudicial error for the district court to admit Castillo's November 29 statement to Ramirez. He contends that the admission of this testimony was improper under Fed. R. Evid. 804(b)(5) and also violated his rights under the Confrontation Clause, as analyzed by the Supreme Court's ruling in Idaho v. Wright, 110 S. Ct. 3139 (1990). Specifically, Joseph asserts that Castillo's statement lacked sufficient indicia of trustworthiness to be admitted.

### A.

### Standard of Review

The Government of the Virgin Islands (hereinafter Government) argues that because Joseph's attorney failed to object when the hearsay evidence was actually offered during the trial, the issue

was not preserved for appeal, and thus this court should only review this case for plain error. Although the Government recognizes that Joseph raised this issue in a pretrial motion in limine, it argues that such a motion was inadequate to preserve the issue for appeal because Joseph's counsel did not request that the court grant him a continuing objection. In response, Joseph notes that the district court ruled on the motion in limine after the trial had begun and that the trial itself took less than three days.

The Government relies on cases from other circuits for the proposition that a defendant must always interpose a contemporaneous objection to preserve the objection for appeal. The cases cited are distinguishable,[2] and, in any event, our precedent is otherwise.

In American Home Assurance Co. v. Sunshine Supermarket, Inc., 753 F.2d 321 (3d Cir. 1985), American Home, an insurance carrier that filed a declaratory judgment action claiming that it was not liable under the policy it issued to Sunshine Supermarkets because, inter alia, Sunshine employees had deliberately set fire to the supermarket, filed a motion in limine to prevent introduction of evidence that no criminal prosecution for arson had been instituted. The district court ruled that if the insurance company introduced evidence that Virgin Islands officials believed that the fire was deliberately set, Sunshine could admit the evidence of non-prosecution. Following American Home's introduction of such evidence, Sunshine's evidence that no prosecution for arson had been instituted was admitted without contemporaneous objection by the insurer.

We rejected the contention that the insurer's objection had not been adequately preserved. We held, instead, that "if an issue is

---

[2] In several of the cases cited by the Government, there is no indication that the defendant challenged admission of the evidence, either by contemporaneous objection or motion in limine. See United States v. Segal, 852 F.2d 1152, 1155-56 (9th Cir. 1988); United States v. Bowie, 892 F.2d 1494, 1498 (10th Cir. 1990); United States v. Devous, 764 F.2d 1349, 1353 (10th Cir. 1985). In United States v. Gironda, 758 F.2d 1201, 1215-16 (7th Cir.), cert. denied, 474 U.S. 1004 (1985), the defendant merely mentioned that admission of evidence "might present Sixth Amendment problems," failed to raise the argument again, and the trial court never ruled on that issue. In United States v. Khoury, 901 F.2d 948, 966 (11th Cir. 1990), the district court denied the in limine motion without prejudice to renew objection at trial, and the defendant failed to renew that objection. None of the cases raised the precise issue here: whether an objection raised in writing in limine and decisively rejected by the district court is preserved for appeal.

fully briefed and the trial court is able to make a definitive ruling, then the motion in limine provides a useful tool for eliminating unnecessary trial interruptions." Id. at 324. We noted that the insurer had filed a written pretrial motion requesting that the evidence of non-prosecution not be admitted, and "set forth reasons, including case citations, in support of the request." Id. Additionally, "[t]he trial court held a hearing at which it considered the arguments of counsel and made a definitive oral ruling with no suggestion that it would reconsider the matter at trial." Id. at 324-25.

Although American Home was a civil case and governed by Fed. R. Civ. P. 46, that rule is similar to Fed. R. Crim. P. 51. We relied on American Home in United States v. Pearce, 792 F.2d 397, 400 n.4 (3d Cir. 1986), a criminal case, where we concluded that failure of the defendant to raise his objection at trial did not constitute waiver because defendant had presented the issue adequately in a pretrial motion and memorandum and the trial court had clearly indicated that it would not permit defendant to raise that defense at trial.

■ There is adequate basis under the authority of American Home and Pearce for holding that Joseph's objections have been preserved. Joseph's counsel made a written pretrial motion, supported by several case citations, to exclude Castillo's November 29 statement as to who shot him.[3] In addition, the district court held a hearing after the start of trial in which both counsel were given a chance to advocate their positions. Finally, the district court made a definitive ruling "with no suggestion that it would reconsider the matter at trial." See American Home, 753 F.2d at 325. Although we agree with those courts that have emphasized the general policy behind the contemporaneous objection rule of "discourag[ing] counsel from refraining from making an objection at trial in order to reserve the opportunity to assert reversible error on appeal," see United States v. Roenigk, 810 F.2d 809, 815 (8th Cir. 1987), under the

---

[3] In contrast, in United States v. Roenigk, 810 F.2d 809 (8th Cir. 1987), cited by the Government, defendant had made an oral pretrial motion in limine to limit the government in introducing certain evidence, and the district court *granted* that motion in part. Because defendant failed to object to that evidence when it was introduced notwithstanding the district court's ruling, the court of appeals concluded that its review was for plain error. Thus, Roenigk presented a case where the defendant failed to object at trial to secure the benefit of a favorable ruling he had received before trial, a different issue than that presented here.

circumstances here contemporaneous objection would not have aided the district court which had thoroughly considered the issue just the day before the evidence was offered.

## B.

### The District Court's Ruling

Because Joseph's constitutional challenge to the admission of Castillo's November 29 statement involves the application of legal precepts, our review is plenary. See United States v. Kelly, 892 F.2d 255, 260 (3d Cir. 1989), cert. denied, 110 S. Ct. 3243 (1990).

The district court admitted the November 29 statement under the residual hearsay exception of Fed. R. Evid. 804(b)(5).[4] On the central issue as to whether the statement met the Rule's requirement that the statement have "equivalent circumstantial guarantees of trustworthiness" to those covered by other hearsay exceptions, the Government stated that "[it] frankly can conceive of no reason why the victim would want to identify Mr. Joseph over the codefendant," app. at 62, referring to the corroborative evidence.

The district court then sua sponte raised the question whether there were adequate indicia of trustworthiness to satisfy the Confrontation Clause. The Government responded that it was provided by the evidence that would show there were two guns used, one a .38 revolver, since that was the type of bullet found in Castillo's body and the type of gun that a witness (Quinones) would testify he saw in Joseph's hand as he was leaving the scene, and the other a semiautomatic pistol which Rivera used to shoot at Mercado, verified by a 9 millimeter bullet recovered in the hallway. The Government also argued "that there is no evidence that the defendant would have any greater ill will or animosity toward this de-

---

[4] Rule 804(b)(5), one of two residual hearsay exceptions, states in pertinent part that if the declarant is unavailable, the following is not excluded by the hearsay rule:

A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed. R. Evid. 804(b)(5).

fendant than he would have toward the codefendant. Both of them were involved in a robbery of him." App. at 67. The Government posed the rhetorical question "if he's able to discern which of the two shot him, why would he misidentify, mislead the police as to the identity of the shooter?" App. at 67.

The defendant's objection was limited to the trustworthiness of the statement. The only reason given by the defense to show the second statement would be untrustworthy was the "indication that Mr. Castillo was involved in drug activity. That this was the reason why Mr. Joseph and Mr. Rivera were in Mr. Castillo's apartment." App. at 72. Thus, the defense hypothesized that this might color Castillo's view of Joseph over Rivera, and vice versa. However, on the basis of the record before us, the only evidence of a prior relationship was Joseph's statement that "Ramon [Castillo] give me a job . . . but the money get violate." App. at 209. Whatever this means, it does not expressly refer to any drug activity by Mr. Castillo and counsel's suggestion must be treated as pure speculation.

The court allowed the statement of November 29 as a Rule 804(b)(5) exception, after noting the corroborating evidence referred to by the Government.

## C.

### Trustworthiness

Neither party called to the district court's attention the Supreme Court's decision the year before in Idaho v. Wright, 110 S. Ct. 3139 (1990). In Wright, the Court, speaking through Justice O'Connor, analyzed the circumstances under which admission of hearsay evidence is permissible under the Confrontation Clause.[5] The defendant in Wright, charged with two counts of lewd conduct on her minor daughters, aged 5½ and 2½, challenged the admission of certain statements which the younger daughter had made to Dr. Jambura, a pediatrician with extensive experience in child abuse cases. These statements had been admitted under Idaho's residual exception to the hearsay rule. The Supreme Court agreed with the Idaho Supreme Court that admission of the testimony violated defendant's rights under the Confrontation Clause.

---

[5] The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.

The Court began its analysis by noting that "the [Confrontation] Clause does not necessarily prohibit the admission of hearsay statements against a criminal defendant, even though the admission of such statements might be thought to violate the literal terms of the Clause." Id. at 3145. That view was rejected as "'unintended and too extreme.'" Id. (quoting Bourjaily v. United States, 483 U.S. 171, 182 (1987)).

Instead, the Court reiterated the general analytic framework set forth in Ohio v. Roberts, 448 U.S. 56(1980), for determining when statements which are admissible under an exception to the hearsay rule also meet the requirements for the Confrontation Clause. This requires a twofold inquiry. First, the prosecution ordinarily must produce or demonstrate the unavailability of the declarant.[6] Id. at 65. Second, the prosecution must show that the statement bears adequate "indicia of reliability." Id. at 66.

In considering the relationship between the Confrontation Clause and the Federal Rules of Evidence the Court observed that it has been "careful not to equate the Confrontation Clause's prohibitions with the general rule prohibiting the admission of hearsay statements. The Confrontation Clause, in other words, bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule." Wright, 110 S. Ct. at 3146 (citations omitted). Importantly, "[r]eliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." Id. In this connection, the Wright Court noted that "Idaho's residual hearsay exception . . . is not a firmly rooted hearsay exception for Confrontation Clause purposes." Id. at 3147.

Because the residual hearsay exception embodied in Fed. R. Evid. 804(b)(5) at issue here is essentially the same as the state evidentiary rule considered in Wright, we must determine whether the prosecution made a sufficient showing of particularized guarantees of trustworthiness for Confrontation Clause purposes.

---

6 Clearly, Castillo, who was dead by the date of trial, was unavailable. See Fed. R. Evid. 804(a)(4). We note in passing that recently in White v. Illinois, 112 S. Ct. 736 (1992), the Court held that with respect to hearsay statements admitted under the "firmly rooted" spontaneous declaration and medical examination exceptions, the Confrontation Clause does not require that the prosecution prove that the declarant is unavailable.

399

Significantly, in Wright the Court rejected the State's argument that a finding of "particularized guarantees of trustworthiness" should be based not only on the circumstances surrounding the making of the statement but also on other evidence at trial that corroborates the truth of the statement. The Court stated instead that "'particularized guarantees of trustworthiness' must be shown from the totality of the circumstances, but we think the relevant circumstances include *only* those that surround the making of the statement and that render the declarant particularly worthy of belief." Id. at 3148 (emphasis added).

The Court explained why the Confrontation Clause analysis must be made independent from reference to other evidence at trial. Specifically, "the use of corroborating evidence to support a hearsay statement's 'particularized guarantees of trustworthiness' would permit admission of a presumptively unreliable statement by bootstrapping on the trustworthiness of other evidence at trial." Id. at 3150. Instead, "the presence of corroborating evidence more appropriately indicates that any error in admitting the statement might be harmless, rather than that any basis exists for presuming the declarant to be trustworthy." Id. at 3150-51 (footnote omitted).

Thus, in Wright, in analyzing the admissibility of the statements made by defendant's younger daughter to Jambura, the Court declined to factor corroborating evidence into its calculus, and looked only to factors related to the circumstances surrounding the making of the statement. These factors were the child's lack of motive to "'make up a story of this nature'" and whether "the statements are of the type 'that one would expect a child to fabricate.'" Id. at 3152.

The Court held that viewing the totality of the circumstances, there was "no special reason for supposing that the incriminating statements were particularly trustworthy." Id. The Court noted that Jambura's questions were leading and the younger daughter's statement regarding the abuse of her older sibling, which apparently was volunteered during a lull in Jambura's questioning, "was not made under circumstances of reliability comparable to those required, for example, for the admission of excited utterances or statements made for purposes of medical diagnosis or treatment." Id. The prosecution had thus failed to rebut the presumption of inadmissibility accorded accusatory hearsay statements not admitted pursuant to a firmly rooted hearsay exception.

■ When viewed in light of the Wright analysis, it is evident that the district court's decision to admit the November 29 statement erroneously relied on corroborating evidence. See United States v. Kikumura, 918 F.2d 1084, 1103 n.21 (3d Cir. 1990) (distinguishing between assessment of reliability of hearsay statement at trial and at sentencing because "the sentencing court's inquiry is not limited to 'circumstances that surround the making of the statement'"); see also United States v. Gomez-Lemos, 939 F.2d 326, 333 (6th Cir. 1991) (Wright overruled those cases which have considered "corroborative evidence in deciding whether the uncross-examined testimony of a witness meets the trustworthiness requirements of Roberts"); United States v. Ellis, 935 F.2d 385, 394 (1st Cir.), cert. denied, 112 S. Ct. 201 (1991); Webb v. Lane, 922 F.2d 390, 396 n.9 (7th Cir. 1991); McCafferty v. Leapley, 944 F.2d 445, 451 (8th Cir. 1991), cert. denied, 112 S. Ct. 1277 (1992). But see United States v. Mokol, 939 F.2d 436, 440 (7th Cir. 1991) (approving of assessment of corroborating evidence and not citing Wright); United States v. Panzardi-Lespier 918 F.2d 313, 319 (1st Cir. 1990) (finding Rule 804(b)(5) to be a "firmly rooted" exception without citing Wright).

The district court's erroneous reliance on corroborating evidence requires us to decide whether the November 29 statement was admissible without reference to the corroborating evidence on the ground that there were other sufficient guarantees of trustworthiness or whether its admission was harmless error.

In arguing that Castillo's statement to Ramirez was trustworthy, the Government analyzes the following factors listed as relevant to the reliability inquiry under the Confrontation Clause in United States v. DeLuna, 763 F.2d 897, 910 (8th Cir.), cert. denied, 474 U.S. 980 (1985), a case decided before Wright:

(1) whether the context of the statements and the persons to whom they were made suggest that the statements are reliable, (2) whether the declarant had a motive for lying, (3) whether the declarant had difficulty with his or her memory, and (4) whether the declarant had personal knowledge of the identity and role of the participants in the crime.

The DeLuna court noted that it was not necessary to meet all four factors to satisfy the requirements of the Confrontation Clause. Id.

■ We are unprepared to use these factors as the exclusive considerations in a Confrontation Clause inquiry. The Supreme Court

in Wright explicitly "decline[d] to endorse a mechanical test for determining 'particularized guarantees of trustworthiness.'" 110 S. Ct. at 3150. The key inquiry is whether "the test of cross-examination would be of marginal utility." Id. at 3149. If so "then the hearsay rule does not bar admission of the statement at trial." Id.

■ The Government argues, with some persuasion, that the November 29 statement meets this test. It is closely parallel to the November 20 statement, albeit more detailed. However, it is not sufficient to argue that Castillo had no motive for lying. Instead, the burden is on the Government to show that Castillo had a motive for telling the truth. As the Court stated in Wright, "unless an affirmative reason, arising from the circumstances in which the statement was made, provides a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial, the Confrontation Clause requires exclusion of the out-of-court statement." Id. at 3150.

Thus we would have to decide whether a statement by a victim identifying his or her assailant carries with it the same guarantees of trustworthiness as more firmly rooted hearsay exceptions. Arguably, at least in this case, this situation is analogous to the hearsay exception for statements for purposes of medical diagnosis or treatment. See Fed. R. Evid. 803(4). The rationale for the exception for such statements is the patient's strong motivation to be truthful. See Fed. R. Evid. 803 advisory committee's note. A victim of an assault is likely to have a similarly strong motivation to assure that his or her assailant is correctly identified, located, tried and convicted in order to prevent another assault.[7]

Nonetheless, we are reluctant to base our decision on this ground because it was not fully explored in the district court. There are too many factual implications regarding Castillo's motivation to have such a finding made in the first instance on appeal.

We turn then to the Government's second argument, that of harmless error. The Court in Wright expressly suggested that there

---

[7] Cf. State v. Beam, 292 N.W.2d 302, 306 (Neb. 1980) (approving trial court's admission of victim's statements to attorney because they were made "in the course of a professional consultation for the purpose of legal advice and possible litigation" and thus it was reasonable to assume accurate facts would be given); State v. Bailey, 365 S.E.2d 46, 49 (W. Va. 1987) (concluding that wife's statement implicating her lover, whom she later married, which was contrary to her "social" interests, was analogous to statement against penal, proprietary, or pecuniary interests).

was room for harmless error analysis when a statement was admitted erroneously relying upon corroborating evidence. See Wright, 110 S. Ct. at 3150-51 ("we think the presence of corroborating evidence more appropriately indicates that any error in admitting the statement might be harmless").

Relevant to this analysis is the fact that many of the significant details set forth in the November 29 statement were already in evidence through the concededly admissible November 20 statement. In Castillo's statement of November 20, remarkably detailed considering his condition, Castillo was able to describe the two intruders, stating that both men were short, that the clean cut man had short hair and wore a big pendant on a chain, and that the other man wore his hairlocks in a knot. Both the November 20 and November 29 statements were consistent as to several important details, most significantly that Castillo said that he was upstairs and that two men came in and demanded money. In both statements he stated that one of the two was clear skinned.[8]

In the November 29 statement, made after Castillo's condition stabilized, Castillo gave more details, i.e. that he had just come home from buying some parts to fix his car and that he told the intruders that he had only thirty dollars when they demanded money. He also stated that the clear skinned man hit him on the head with a gun butt and then shot him, and that the other man shot at his stepson as the two men were leaving. In response to further questions by Sgt. Ramirez, Castillo said that he had no weapon and that the weapon used to shoot him could have been a .38 and that the one the other man had was a machine gun.

Thus, defendant agrees that our harmless error analysis must focus on the significance in the context of this case of the additional details, i.e. that the clear skinned man (later identified as Joseph) hit Castillo on the head with a gun butt and that it was he who shot Castillo.

The Government argues that there was substantial corroborating evidence to place the .38 revolver that fired the shot in Joseph's hand, including: (1) the testimony of Quinones, an eyewitness, who saw Joseph in possession of a revolver minutes after the crime; (2) Mercado's testimony that Rivera was also in possession of a

---

[8] The Government's brief explains this is the local term used to describe an individual of light complexion.

403

handgun as they fled Castillo's bedroom moments after the shooting; (3) Mercado's testimony that Rivera fired at him in the hallway as the two intruders fled; (4) the recovery of a .38 caliber projectile from Castillo's body at the autopsy but recovery of a 9 millimeter shell casing and spent projectile from the hallway just outside Castillo's bedroom, suggesting two different weapons;[9] (5) police observation, the witnesses' description, and the production of photographs of a bullet hole in the hallway just outside Castillo's bedroom, which is where Mercado testified Rivera fired at him; and (6) the absence of any bullet hole in the walls or door of the victim's bedroom, which Joseph claimed was closed at all times when the two shots were fired.

While this evidence would support a jury finding that it was Joseph who shot Castillo, we choose not to rest our decision on that basis. Instead, we conclude that its admission was not reversible error because Joseph's identity as the shooter was never a contested issue in this case.

This is not a case where the defendant argued mistaken identity and claimed that he had nothing to do with the events which were the basis of the charge. On the contrary, the issue as presented to the jury by the defense was whether "*Mr. Joseph shot* Mr. Castillo either with premeditation, pre-planning and deliberation, *or did he shoot him* in self-defense?" Trial Tr. Vol. I at 48 (emphasis added). In fact, at trial, Joseph admitted that he and Jose Rivera (also called P.D.) were in Castillo's bedroom, that his hand was on the gun, and that the gun went off, shooting Castillo.

Joseph's version of the facts were that he and Rivera went by the bar and talked to Castillo, "and we told him that we're there to talk to him. And then after he said let's go upstairs, and we went upstairs inside his bedroom, and he locked the door." App. at 222. He said Castillo asked Rivera for his money, Rivera and Castillo had an argument, and Castillo pulled a gun and shot Rivera in his left arm. He stated, "[w]hen they had the argument and when he pulled the gun, he shot Rivera on his left arm, and *we get into the struggle*. And the gun went off, and I jumped back because I thought I had get shot because the gun went off between me and

---

[9] The defense at trial suggested that the only weapon in the room was the gun Castillo allegedly had.

Mr. Castillo." App. at 225 (emphasis added).[10] Castillo fell to the floor and he and Rivera opened the door and ran downstairs.

It is evident that nothing in Joseph's testimony attempted to place the responsibility for the shooting on Rivera. Similarly, in the voluntary statement Joseph gave to Police Officer Ruby Urgent after he was apprehended, he did not attempt to implicate Rivera as the shooter. Instead, he stated:

> Ramon give me a job, right, but the money get violate. Now, when I went to the house to let he know, we get in an argument. He pull a gun on we, and we tried to get it from he. That's when P.D. get shot in he hand.
>
> Question: What kind of gun did Ramon pull?
>
> Answer: It was like a snub nose .38.
>
> Question: Exactly what happened?
>
> Answer: When he pull the gun, right, me and P.D. grab he hand. We been wrestling for the gun. Then P.D. get shot in his hand, then I hold Ramon and trying to get the gun, then the gun went off and I jumped back to check myself. He, Ramon, fall on the ground then. I just bust through the door, and we went in the car and sped off.

App. at 209.

The jury was presented with two diametrically different views of the shooting, that of the Government which was that Rivera and Joseph entered the Castillo apartment uninvited for purposes of a robbery or burglary, carrying guns; that Joseph shot at Castillo with a .38 revolver and hit him; and that Rivera shot at Mercado with a 9 millimeter semiautomatic pistol and missed.

The defendant's view was that the men were invited in by Castillo; that Castillo had a gun which he fired at Rivera after an argument; that Castillo's arm was deflected in a struggle and he was shot accidentally or in self-defense. As set forth by Joseph's counsel in her summation to the jury, "[w]hat are we concentrating on, was there a struggle or was not there a struggle? Did Mr. Joseph shoot Mr. Castillo, or didn't he shoot Mr. Castillo? Did the gun go off in a struggle for the gun, or didn't it." Trial Tr. Vol. II at 427.

---

[10] On cross-examination, Joseph testified, "[Castillo] pull a gun and shot Jose Rivera in his hand, and the three of us had to struggle for the gun; the gun went off, and he got hit." App. at 237.

■ Thus, the jury's task as defined by the defense was to decide the circumstances of the shooting, not whether Joseph or Rivera fired the gun. Because the portion of the statement of November 29 identifying Joseph as the shooter did not relate to a contested issue before the jury,[11] its admission was harmless.[12]

The Court has recently reiterated "the general rule that a constitutional error does not automatically require reversal of a conviction." Arizona v. Fulminante, 111 S. Ct. 1246, 1263 (1991). Of particular relevance here is the holding that evidence erroneously admitted which does not bear on a disputed issue is likely to be harmless. See United States v. Lang, 904 F.2d 618, 626 (11th Cir.) (finding admission of hearsay evidence in violation of Confrontation Clause to be harmless because "the additional information adduced through [the declarant's] testimony was not essential to [government's] case"), cert. denied, 111 S. Ct. 305 (1990). In this case, we are satisfied "that [the] error [was] unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." Yates v. Evatt, 111 S. Ct. 1884, 1893 (1991). We accordingly reject Joseph's Confrontation Clause challenge to his conviction.[13]

---

[11] As a legal matter, it is irrelevant which of the two intruders was the principal assailant here. See V.I. Code Ann. tit. 14, § 11(c) (1964) (no fact need be alleged in information against aider or abettor "other than is required in the information against the principal"). The jury was entitled to find that Joseph and Rivera aided and abetted each other. V.I. Code Ann. tit. 14, § 11(a) (1964). Courts commonly sustain voluntary manslaughter convictions based on evidence of aiding and abetting. See State v. Swingler, 632 S.W.2d 267, 270 (Mo. Ct. App. 1982). See generally Annotation, *Who Other than Actor Is Liable For Manslaughter*, 95 A.L.R. 2d 175 (1964).

[12] We recognize that the November 29 statement includes the reference "that the clear-skinned guy, individual, hit him with a gun butt on his head" before he shot him. App. at 190. A jury accepting Castillo's version of the events set forth in the November 20 statement would have had ample basis for finding an assault by both Rivera and Joseph. See V.I. Code Ann tit. 14, § 291 (1964).

[13] We need not decide whether admission of the November 29 statement was appropriate under the residual hearsay exception of Fed. R. Evid. 804(b)(5). See Wright, 110 S. Ct. at 3146. Having found the admission of the statement was harmless error at a constitutional level, the same result would follow even were it admitted erroneously from an evidentiary standpoint.

## III.

For the reasons set forth we will affirm the judgment of conviction and sentence.