**Joseph L. RAINER, Appellant,**

v.

**DEPARTMENT OF CORRECTIONS, Appellee.**

**No. 89–5214MN.**

United States Court of Appeals, Eighth Circuit.

Submitted May 16, 1990.

Decided Sept. 19, 1990.

James M. Lockhart, Minneapolis, Minn., for appellant.

John E. MacGibbon, Elk River, Minn., for appellee.

* DANIEL M. FRIEDMAN, Senior Circuit Judge, of the U.S. Court of Appeals for the Federal Circuit, sitting by designation.

Before ARNOLD, Circuit Judge, and HEANEY and FRIEDMAN,* Senior Circuit Judges.

FRIEDMAN, Senior Circuit Judge.

This is an appeal from an order of the United States District Court for the District of Minnesota, David S. Doty, J., denying the appellant Rainer's application for Writ of Habeas Corpus. Rainer challenges his conviction in the Minnesota State court for first degree murder on two grounds: (1) he was denied his sixth amendment right to effective assistance of counsel because of the alleged improper involvement of a State investigator in the testing by the defendant's ballistics expert of the gun used in the killing, and (2) he was denied his fourteenth amendment right to a fair trial by the admission of evidence relating to his prior bad acts. We hold that neither event denied Rainer his constitutional rights and therefore affirm the denial of the writ.

I.

Rainer was convicted by a jury of first degree murder of his girl friend, Marla Forrest, by shooting her in the back with a shotgun and sentenced to life imprisonment. There is no question that he shot her. The issue at trial was whether he intentionally and premeditatedly killed her, as the prosecuting attorney contended, or whether the killing resulted from the accidental firing of the shotgun, as he asserted.

A. The circumstances surrounding the killing are not in dispute.

Rainer and Forrest had known each other since the summer of 1983, and had spent considerable time together. Rainer wanted to marry her. She, however, did not want to do so. Within two weeks before the shooting, Forrest told friends that she planned to terminate their relationship.

On the day of the shooting in October 1984, Forrest and her nine-year-old son, Tobi, went to Rainer's house so that he could replace the engine of her car. Dur-

ing the afternoon, Forrest and Rainer talked and drank beer, she spoke with her father on the telephone, and told him that she would use Rainer's car to return home.

Tobi testified that later in the afternoon he heard Rainer and Forrest arguing. He went into the kitchen where they were, and his mother told him to go to Rainer's car and wait for her. Fifteen minutes later, Tobi heard a gun shot.

Rainer gave the police the following version of what happened. Soon after Tobi went to the car, Rainer walked Forrest to the car. On the way, he picked up his shotgun that he had left lying in the breezeway, and tucked it under his arm. The gun accidentally fired, the shot hitting Forrest in the back and killing her. Rainer said that he had been shooting squirrels that morning and left the gun in the breezeway and that he picked it up to get it out of the mist.

Rainer's former wife, Maxine, testified that he normally kept his guns loaded. Tobi testified that he had seen the gun earlier in the living room leaning against the wall near the gun case, and not in the breezeway.

Medical evidence was presented at the trial that Forrest was shot from one or two feet away, and that the shot entered her body at a downward angle of between 10 and 20 degrees. The angle at which the shot entered her body was important in determining whether the gun was under Rainer's arm when it fired, as he claimed, or whether it was at his shoulder, the normal position for intentional firing, as the prosecution hypothesized.

Expert testimony established that the gun required cocking before firing, but had no safety device, and that a moderate-to-heavy blow without the trigger being pulled did not result in firing when the gun was tested by dropping it or striking it with a rubber mallet when it was cocked. No tests were made concerning pulling the gun along clothing, though the expert agreed that the gun could be cocked by catching it on clothing.

B. After the Minnesota Supreme Court affirmed the conviction, *State v. Rainer*, 411 N.W.2d 490, 494 (Minn.1987), Rainer filed an application for a writ of habeas corpus under 28 U.S.C. § 2254 (1988) in the United States District Court for the District of Minnesota. He argued that in two respects his State conviction violated his constitutional rights. First, in violation of the sixth amendment right to effective assistance of counsel, the State improperly had participated in a test of the murder weapon made by a ballistics expert his lawyer had hired. Second, he had been denied a fair trial by the introduction of evidence of his prior bad acts.

The district court referred the application to a United States Magistrate for a Report and Recommendation. In a detailed opinion, the magistrate concluded that neither the State's involvement in the testing of the murder weapon by the ballistics expert nor the introduction of the evidence of Rainer's prior bad acts violated Rainer's constitutional rights. The magistrate therefore recommended that Rainer's application for habeas corpus should be denied. The district court adopted the magistrate's Report and Recommendation and denied the writ.

II.

A. The facts relating to Rainer's claim of denial of effective assistance of counsel are as follows:

Rainer's counsel hired a firearms expert in Wisconsin, Richard Thompson, to test the murder weapon, primarily to determine the likelihood that it was fired accidentally, as Rainer contended. A State investigator from the local Minnesota sheriff's office, Ferdinand Trebesch, took the gun from Minnesota to Thompson in Wisconsin. Upon delivering the gun and with Thompson's consent, Trebesch stayed and watched Thompson's tests. After Thompson completed his tests, Trebesch returned the gun to Minnesota and prepared a written report describing the testing.

In his report, as summarized by the Minnesota Supreme Court, Trebesch

> quoted Thompson as saying some very negative things about the defendant's story, particularly with regard to the an-

gle of the wound and the position in which the gun was held. Trebesch's report also indicated that Thompson had played a videotape of the sheriff's department's reconstruction of the incident which Trebesch had taken with him.

Defense expert Thompson's report focused primarily on the question of the possibility of accidental discharge. His tests indicated that the gun would fire when hit on the bottom of the pistol grip when cocked, but not when hit elsewhere or dropped. He also commented on the extremely heavy recoil. He estimated that the shot which killed Forrest was fired from a distance of between 6 and 24 inches. He mentioned in his report that his estimate was based in part on [his] conversation with Investigator Trebesch.

411 N.W.2d at 494.

Thompson discussed his conclusions with Rainer's attorney and wrote a report, which the defense received on April 15th and which was delivered to the State on April 16, the day before the trial began. On April 17, voir dire of prospective jurors indicated that the defense intended to call a ballistics expert from Wisconsin. On that date, Trebesch's report, dated March 24, was given to defense counsel. Defense counsel moved for a mistrial, a continuance, or a ruling that the State could not introduce the report in evidence. The trial court denied a mistrial and a continuance and denied at that time the motion to bar the State's use of the evidence, thus permitting Rainer to raise the issue again later in the trial.

B. In rejecting Rainer's claim of denial of effective assistance of counsel, the Minnesota Supreme Court held:

[H]ere there is little basis for a sixth amendment claim. Thompson apparently gave information voluntarily to the state investigator. An investigator is permitted to talk to a potential witness, without a *Miranda* warning, and the witness is free to refuse to talk. Trebesch was not present by subterfuge or disguise, as was Weatherford in *Weatherford v. Bursey*, where an undercover agent sat in on

a defense meeting because he had been arrested at the same time as the defendant. 429 U.S. 545, 547, 97 S.Ct. 837, 839, 51 L.Ed.2d 30 (1977). Further, Trebesch's information was not used at trial. *See United States v. Brugman*, 655 F.2d 540, 546 (4th Cir.1981). Nor is there any indication that the defense expert was influenced in his conclusions by his conversations with the state investigator or by the state's videotaped re-enactment of the incident. While it would have been preferable that a state investigator not be present to observe defense tests, to hear unguarded comments, and to discuss the case with the expert before the expert formulated conclusions, the presence of the state investigator in this case does not rise to the level of a sixth amendment problem.

*Rainer,* 411 N.W.2d at 494–95.

In concluding that Rainer was not entitled to habeas relief on his sixth amendment claim, the magistrate upheld, as supported by the record, the findings of the Minnesota Supreme Court upon which that court based its rejection of the claim. The magistrate further held that Rainer "has not established any prejudice" from the alleged violation of Rainer's sixth amendment rights. *Rainer v. Dep't of Correction*, Report & Recommendation, Civ. No. 4–87–1045, slip op. at 6 (D.Minn. July 6, 1988). The magistrate referred to the Minnesota Supreme Court's findings that there was "no indication that the conduct of the state's investigator affected the outcome of physical, objective tests performed by Mr. Thompson (i.e. that it was extraordinarily difficult to elicit an accidental discharge from petitioner's shotgun).... If anything, the more detailed report by investigator Trebesch allowed defense counsel to reconsider the wisdom of calling Mr. Thompson as a witness. Further, defense counsel was able to elicit some favorable testimony from the state's expert regarding the possibility that the shotgun could be cocked by catching it on clothing." *Id.* at 6 (citations omitted).

Finally, the magistrate rejected Rainer's

claim that the trial court should have either granted a continuance or excluded the Trebesch report from evidence [as] without merit. The Minnesota Supreme Court found the report was disclosed in a timely manner, and that the trial court did not foreclose the possibility that the Trebesch report would be excluded if Mr. Thompson testified. *Rainer, supra,* at 494. The issue became moot when defense counsel decided not to call Mr. Thompson without renewing the motion to exclude the Trebesch report. No offer of proof was made in connection with the motion for a continuance, and there is no indication in the record that the Trebesch report was inaccurate or that defense counsel could have obtained favorable expert testimony if a continuance had been granted.

*Id.* at 7.

■ C. "To establish a sixth amendment violation, a criminal defendant must show two things: first, that the government knowingly intruded into the attorney-client relationship; and second, that the intrusion demonstrably prejudiced the defendant ... or created a substantial threat of prejudice." *United States v. Singer,* 785 F.2d 228, 234 (8th Cir.1986) (citations omitted).

■ This court, like the district court, accords a "presumption of correctness" to the state court's findings of fact. *Sumner v. Mata,* 449 U.S. 539, 545–47, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981); *Pittman v. Black,* 764 F.2d 545, 545–46 (8th Cir.), *cert. denied,* 474 U.S. 982, 106 S.Ct. 389, 88 L.Ed.2d 341 (1985). Rainer has not challenged those findings, and we accept them. We agree with the Minnesota Supreme Court's conclusion, based upon those findings, that "the presence of the state investigator in this case does not rise to the level of a sixth amendment problem." 411 N.W.2d at 495.

III.

Rainer challenges, as a violation of his 14th amendment right to a fair trial, the admission of evidence relating to his prior bad acts.

A. The Minnesota Supreme Court described the evidence as follows:

Patricia Curran Rainer, defendant's third wife, testified that in 1982 when she came home from a meeting twenty minutes late, defendant asked to whom she had been talking and why she was late, then grabbed her by the neck, threw her on the bed, put his knee on her chest, pressed her throat and said, "Woman, I will kill you" or "I will kill you, woman." Randy Lehner, defendant's second wife, testified that in 1974 when she and defendant were still living together, she stopped by defendant's service station and argued with the woman whom defendant had been seeing, and when the woman refused to leave, defendant pulled Lehner out of the station by her hair.

Maxine Rainer, defendant's first wife, testified to three incidents that occurred while she was married to defendant, an assault with a rifle, with a knife, and with a towel. Once in about 1965, when she was half an hour or an hour late back from shopping, defendant pushed her onto the bed, pointed a loaded rifle at her with his hand near the trigger, touched the barrel to her chest, and said that if she were late again, he would kill her. In 1966, in an argument he pushed her onto the bed and held a knife to her throat. And in 1966 or 1967, as she was getting ready to go out, he accused her of going to meet someone and wrapped a towel around her neck and started to strangle her. Howard Mockros, a friend of Maxine Rainer, testified that one time in 1968, after Maxine's divorce, when he was in the vicinity of her house, defendant arrived, yelled at him, then shot at or around him a number of times, at a distance of a car length or two as Mockros stood there. Maxine Rainer described the same incident, with some variation between the two stories.

*Rainer,* 411 N.W.2d at 496.

The Minnesota Supreme Court held that this evidence was "properly admitted." 411 N.W.2d at 498. The court ruled that the incidents "were proved by clear and

convincing evidence," and that these were "incidents of past violence, each one toward a significant woman in defendant's life (or someone closely associated with her), out of jealousy or anger, presented to disprove defendant's assertion that the gun's discharge was an accident. This shows a repeating pattern of very similar conduct not merely a general propensity toward violence." *Id.* at 497. The court further held that the "prejudicial effect of the ... incidents in this case is outweighed by their probative value." *Id.* at 498.

In rejecting Rainer's unfair trial claim, the magistrate found "no error in the trial court's admission of evidence of petitioner's prior bad acts that could be said to have fatally infected the trial and denied him due process of law." Slip op. at 9.

■ B. Because questions concerning the admission of evidence are matters of State law, our review of such questions in a habeas corpus proceeding is limited to determining whether the defendant's constitutional rights have been violated. *Amos v. State of Minn.*, 849 F.2d 1070, 1073 (8th Cir.1988); *Hobbs v. Lockhart*, 791 F.2d 125, 127–28 (8th Cir.1986) (other crimes evidence). The inquiry is not "whether the trial court erred in admitting the particular testimony," but "whether the admissions resulted in a trial so fundamentally unfair as to deny [Rainer] due process of law." *Id.* at 127–28. "In making this determination we must review the totality of the facts in the case and analyze the fairness of the particular trial under consideration." *Hobbs*, 791 F.2d at 128 (quoting *Manning–El v. Wyrick*, 738 F.2d 321, 323 (8th Cir.), *cert. denied*, 469 U.S. 919, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984)). To justify the grant of habeas corpus, the error must be "so 'gross' ... 'conspicuously prejudicial' ... or otherwise of such magnitude that it fatally infected the trial and failed to afford [appellant] the fundamental fairness which is the essence of due process." *Mercer v. Armontrout*, 844 F.2d 582, 587 (8th Cir. 1988).

■ We agree with the magistrate that "[u]nder the totality of the circumstances," the admission of the evidence did not deny Rainer a fair trial. Slip op. at 9. Each bad act involved Rainer's violent response to

the rejection of or the challenge of his authority. As the Supreme Court of Minnesota explained, the "incidents of past violence, each one toward a significant woman in defendant's life (or someone closely associated with her), out of jealousy or anger, [were] presented to disprove defendant's assertion that the gun's discharge was an accident. This shows a repeated pattern of very similar conduct not merely a general propensity toward violence." 411 N.W.2d at 497. The trial court repeatedly instructed the jury that it could consider the evidence only with respect to intent and the alleged accidental character of the shooting.

Rainer's contention that the evidence was improperly admitted is but a reargument of the State law question he presented to the Minnesota Supreme Court, which that court rejected. Rainer has not shown that the introduction of this evidence violated his constitutional rights.

The judgment of the district court is affirmed.