**UNITED STATES of America, Plaintiff,**

v.

**LIN LYN TRADING, LTD., and Raymond Lynn Thomas, Defendants.**

**No. 94–CR–168G.**

United States District Court, D. Utah, Central Division.

April 9, 1996.

Wayne Dance, Asst. U.S. Atty., for plaintiff.

Max D. Wheeler, Snow, Christensen & Martineau, Salt Lake City, UT, James D. Gilson, Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, UT, for defendants.

## ORDER OF DISMISSAL OF INDICTMENT

J. THOMAS GREENE, District Judge.

This matter is before the court on defendants' Motion to Suppress evidence seized at the Portland International Airport by the United States Customs Service on March 29, 1991, approximately 3½ years before the Indictment was returned in this case.[1] Defendant Thomas was detained at the airport by customs officials, and various documents in his possession were taken and examined. One item was seized and not returned. The particular item which was seized was a yellow notepad which contained handwritten notes prepared by defendant Thomas for discussion at meetings with his attorneys in connection with an ongoing Customs investigation of Thomas and his business, Lin Lyn Trading. The notes were prepared at the suggestion of his attorneys and were used at two separate meetings with counsel prior to the seizure. Some of the notes were taken by Thomas at the meetings. The notepad set forth specific information as to source of shipments, names of suppliers, the types and amounts of merchandise, and possible defenses to be asserted by defendants. The information contained in the notepad became the subject of specific counts in the Indictment which was returned by the Grand Jury on October 20, 1994. Special Senior Agent ("SSA") Keith T. Seagraves, the Customs Agent who seized the notepad, carefully examined it and determined that it contained very incriminating information concerning matters which he had been told were being investigated by the Salt Lake City Customs Office. Although there was conflicting testimony on the subject, the court finds that Agent Seagraves was told by defendant Thomas that the notepad contained confidential communications between himself and his attorneys. Seagraves related this to the Customs Agent in Salt Lake City who was in charge of the investigation, Special Senior Agent Dale Brua. Portions of the notepad were read to Agent Brua by Agent Seagraves prior to the seizure, and both agents knew that the notepad contained at least portions of privileged information and that the defendant was represented by legal counsel. Nevertheless, it was determined that the notepad should be seized because it contained perceived incriminating material. Agent Brua expressed that the issue of privilege could be determined at some future time, if necessary. Copies were made of the entire contents of the notepad, as well as other documents which were taken from the briefcase of defendant.[2] The notepad was not returned to Thomas and a copy of it was not provided.

Approximately one week later, counsel for defendants demanded return of the notepad because of attorney client privilege. At the instruction of Wayne T. Dance, the Assistant United States Attorney who was handling the case in Salt Lake City, the notepad and copies of it and the other documents which had been taken several days later were placed in a sealed envelope and sent to the Resident Agent in Charge ("RAC") of the Salt Lake City Customs Office where the criminal investigation was ongoing. Agent Seagraves prepared a three page report which listed the documents copied and made reference to the yellow notepad. This report was transmitted to Agent Brua on April 18, 1991.

---

1. Three other motions—to suppress evidence obtained by execution of a search warrant on the premises of defendants, to dismiss for prejudicial delay in the prosecution, and for alleged prosecutorial misconduct—are not reached or ruled upon since this court's ruling on the seizure motion is dispositive.

2. These documents consisted of such items as sales memos, invoices, pages from "Franklin Planner," business cards, tariff schedule, copy of a business check, a fax transmission, price lists, etc.

The sealed notepad and supposedly all copies of it, as well as copies of the other documents, remained in the custody of the Salt Lake City Customs Office and later the U.S. Attorneys Office until the sealed envelop containing those materials was delivered to Magistrate Judge Samuel Alba, who examined the notepad and other documents *in camera* and conducted an evidentiary hearing on February 22–23, 1994.[3] As a result of the evidentiary hearing and Judge Alba's *in camera* inspection of the contents of the sealed envelope, the Magistrate Judge determined that the yellow notepad had been unlawfully seized and recommended to Judge Dee Benson, the United States District Judge assigned to the matter, that the government be ordered to return the notepad "along with any copies thereof." Judge Benson approved that recommendation, and granted defendants' motion for return of the yellow notepad as well as return of all of the non-privileged documents which had been copied. These items were delivered to counsel for defendants on October 25, 1994, just after the Grand Jury returned the Indictment on October 20, 1994.

Unbeknownst to the federal prosecutor, AUSA Dance, or the defendants and attorneys for defendants, SSA Seagraves had created another unmarked and unnumbered file which contained copies of the yellow pad and the other documents which had been copied at the time of seizure in Portland on March 29, 1991. This file was made available to SSA Grossman and was available to custom agents at all times until it was delivered to this court on March 14, 1996. Knowledge of the contents of the file, or any use of the documents contained therein, was denied by Agent Grossman at the hearing on March 22, 1996. Others who may have had knowledge about it were not called to testify.

An evidentiary hearing on the motions pending before this court was conducted on February 15 and March 22, 1996. Former Customs Agent Brua, who was in charge of the case until he retired in September 1991, and Special Customs Agent Dennis Grossman, who was assigned primary responsibility for the case thereafter, testified, along with several other witnesses including defendant Thomas. All of this testimony was given at the hearing on February 15, 1996, before the court learned about the aforesaid unmarked and unnumbered file.

Agent Grossman testified at the hearing on February 15, 1996, that he had primary responsibility for this case from September 1991 until he was transferred to the Portland office in November 1993. Agent Grossman examined many voluminous documents and prepared the case for presentation to the United States Attorney, and supplied information which became the factual basis for the Indictment. He testified that he had never seen the yellow notepad or any copies of it, or any of the documents listed in the 1991 report of Agent Seagraves. He further testified that he had never learned about the contents of the notepad or other documents or obtained any information relating thereto. Agent Grossman acknowledged that he had read the report of Agent Seagraves relating to the seizure, and that he had knowledge that Agent Seagraves had reported to the Salt Lake City Customs Office that the notepad referenced in the report related to the ongoing customs investigation and included personal defense notes of defendant Thomas. He denied that he had learned the names of suppliers of merchandise from China as a result of information contained in the notepad or that he had learned about anything specific other than "undervalued radios" and a missing file which he had been told were referred to in the notepad.

The unmarked and unnumbered file, which had been placed in a sealed envelope on or about February 21, 1996, was delivered to this court by AUSA Dance for *in camera* inspection on March 14, 1996, together with

---

**3.** The hearing was held pursuant to defendants' motion for return of property under Rule 41(e) of the Federal Rules of Criminal Procedure. That Rule provides in pertinent part:

A person aggrieved by an unlawful search and seizure or by the deprivation of property may move the district court ... for the return of the property on the ground that such person is entitled to lawful possession. The court shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted, the property shall be returned to the movant....

Fed.R.Civ.P. 41(e).

an Affidavit of Agent Grossman which sets forth his explanation of the circumstances under which he had gained possession of the file.[4] The file was opened and examined by this judge. It contained a full copy of the notepad in question as well as several other documents of defendants and other items which had been copied but had not been placed in the sealed envelope which was transmitted from Portland to the Salt Lake City Customs office in April 1991, and later examined by Magistrate Judge Alba. This court ordered Agent Grossman to reappear for questioning about the matter, which occurred at the hearing on March 22, 1996.

Agent Grossman testified at the March 22, 1996, hearing that on reflection as he was traveling back to Portland after the February 15, 1996 hearing he remembered the existence of an unnumbered file in Portland.[5] He said that the file had been left for him by Agent Seagraves when Seagraves was transferred from the Portland office upon transfer of Grossman to that office in November 1993. The file in question was unnumbered and contained no heading but there was a yellow sticker attached with this message from Agent Seagraves to Agent Grossman: "Den-

nis. There is *no* Portland case on this guy (SLC) he's all yours". Agent Grossman said that he was very busy in his new assignment at Portland from and after November 1993, and that he did not notice the file until January or February of 1994. At that time Agent Grossman said that he was so "inundated" with new Portland cases that he did not take the opportunity to even open the folder or to take note of its contents. He said that although he knew that it would be unusual and not ordinary for the Portland office to maintain a file on a Salt Lake City based investigation, he didn't notice that the sticker message to him referred to "SLC." He said that he made no connection between the file and the Lin Lyn investigation, a case to which he had been assigned primary responsibility and in which he had very great involvement right up to the time he was transferred and would be a likely witness at the trial. He said that in hindsight he should have sent the folder to the Salt Lake City office, or told his successor agent in Salt Lake City about the file. Agent Grossman testified that when he came across the file in 1994, he was still preoccupied with other

---

4. Special Agent Grossman swore in his affidavit that:

> Sometime in January or February 1994, as I was reviewing Special Agent Seagraves' opened investigative files, as well as notes that he left for my attention, I noticed a folder with a yellow sticker attached to the outside. The note was to my attention and read something like "Dennis, nothing on this guy in Portland, he's all yours". Since I was already inundated with new Portland cases as well as previous Portland cases already in inventory, I took no further action with Special Agent Seagraves' note nor the contents of the folder. The folder laid idle for approximately two years and I never took the opportunity to review its contents.... On February 21, 1996 upon returning to my office in Portland, Oregon I decided to access the file folder.... I briefly glanced over the contents of this folder. I determined that the contents were of various documents to include an affidavit of Special Agent Seagraves, a deposition of Mr. Lynn Thomas, photo copies of a passport, a U.S. Customs Report of Investigation, and other documents or photocopies of documents which appeared to be notes and/or correspondence. I did no further review, examination, nor did I study the documents found in this folder. I have never seen nor have I glanced at these

documents prior to this day.... I immediately telephone U.S. Attorney Wayne Dance, U.S. Attorney, District of Utah, Salt Lake City, Utah. I advised Mr. Dance of the documents that I had found. I also advised Mr. Dance that I only glanced over the documents to determine their relevance. I advised Mr. Dance that I did not study these documents, nor did I take any notes or learn anything from these documents. Mr. Dance asked me to answer, simply yes or no, whether I had observed anything in the documents relating to "Defenses" and I answered "No". I told Mr. Dance that in only glancing at these documents, I did not recognize anything in regard to "Defenses".

5. AUSA Dance filed a document with the court the day before the April 15, 1996 hearing, which represented that U.S. Customs Service "has made a good faith effort to locate all documents in its possession (Salt Lake City, *Portland* and Great Falls offices), which relate to the seizure of items from defendant Thomas at the Portland International Airport on March 29, 1991." Agent Grossman testified at the March 22, 1996 hearing that he did make the search in Portland but that it was strictly a computer search and the unmarked file didn't show up; he didn't recall or think about the unmarked file which he had forgotten was on a table in the Portland office at that time.

things and didn't realize or have any idea that the file contained copies of documents relating to the Lin Lyn customs investigation in Salt Lake City, or that it contained a full copy of the yellow notepad and other documents which were to be the subject of an evidentiary hearing scheduled before Magistrate Judge Alba on February 22–23, 1994, which was at about the same time he "discovered" the file.[6] According to Agent Grossman, he placed the file on a table with other miscellaneous materials and did not review or further look at it for the next two years, until February 21, 1996. He said: "The folder laid idle for approximately two years and I never took the opportunity to review its contents."

Upon return to Portland following the February 15, 1996 evidentiary hearing, in view of his testimony at that hearing to the effect that he had no information or knowledge whatsoever about the contents of the yellow notepad or other documents obtained at the seizure in Portland on March 29, 1991, Agent Grossman testified that he began thinking about the unnumbered file which he had ignored for so long. He said that it then occurred to him that the file might have something to do with this case and the seized notepad. Agent Grossman testified that on February 21, 1996, he rummaged through the stack of materials where that file had been resting since February 1994, found the file and finally opened it and "glanced" at the contents in order to determine relevance and whether the materials did relate to this case. He discovered that indeed this was a file of copies of various materials directly relating to this case, so he called AUSA Dance in Salt Lake City who advised him to seal the file and mail it to the United States Attorneys Office in Salt Lake City without further review. He assured Mr. Dance by telephone that he had seen nothing of any particular significance and that he did not notice anything in the folder relating to defenses which defendants were asserting. He testified that he was completely unaware, even after opening the file and making a short examination of the documents therein that it contained a copy of the seized notepad. In fact, a copy of

the pages from that notepad were attached to a copy of the seizure Receipt which clearly in bold letters said: "1 Yellow Notebook 'Advantage.'" The court finds the testimony of Agent Grossman not to be credible. It is highly unlikely that a seasoned investigator such as Agent Grossman even in a casual review of the contents in the file could have missed seeing the copy of the yellow notepad which had been the subject of so many pointed discussions, inquiries and legal proceedings in which Agent Grossman was directly involved as the responsible case agent.

## FINDINGS OF FACT

As a result of the evidentiary hearings conducted by this court on February 15 and March 22, 1996, in addition to the foregoing findings, the following findings of fact are entered as relates to defendants' motion to suppress.

1. On March 29, 1991, Special Senior Customs Agent Seagraves in Portland, Oregon was advised by U.S. Customs personnel at the Portland International Airport that a passenger had arrived who was under investigation by the Salt Lake City Customs Service Office of Enforcement. The passenger was identified as Raymond Lynn Thomas, President of Lin Lyn Trading, Ltd.

2. SSA Seagraves ascertained from Special Senior Agent Brua in Salt Lake City that a customs investigation of defendant Thomas was ongoing in the Salt Lake City office, that documents had been seized by Customs on January 30, 1991 and that a search of the Lin Lyn premises in Salt Lake City had been conducted by agents of the Salt Lake City Customs Enforcement Office under his direction pursuant to a search warrant in February 1991. Agent Seagraves was told that the ongoing investigation related to false valuations of imported merchandise, false invoicing and other customs violations.

3. After his telephone conference with SSA Brua, SSA Seagraves traveled to the Portland airport and met and spoke with defendant Thomas and told him that he was going to take documents which were in

---

**6.** Agents Brua and Seagraves, but not Agent Grossman, testified at the hearing before Magistrate Judge Alba. Nothing was said or intimated about the unmarked file.

his possession from his briefcase to examine them, which he did. Agent Seagraves reviewed documents which related to importation of merchandise similar to the merchandise Agent Brua said was under investigation. These documents consisted of invoices, sales receipts, price lists and other business documentation for items imported from the far east by Mr. Thomas. Also, a yellow notepad with handwriting of Mr. Thomas on the pages thereof was carefully reviewed by Agent Seagraves.

4. Agent Seagraves noted "obvious overt evidence of illegal importations" set forth in the yellow notepad of Mr. Thomas, including reference to specific merchandise listed under the word "undervalued." One of the items listed as undervalued was "radios." Agent Seagraves also noted the words "false declarations" and "not easily traceable" on the yellow notepad.

5. Agent Seagraves spoke with defendant Thomas about the perceived incriminating statements in the yellow notepad. According to Seagraves, Thomas at first made explanations about the "undervalued" word and other statements in the notepad without reference to attorney client privilege, but that in a later conversation that same day, Thomas claimed that the notes were made for a future conference with attorneys. According to Thomas, he told Agent Seagraves that the notes had been prepared by him for use at meetings which he had already had with his attorneys following the search of his premises in February and that the notes were discussed and added to at those meetings.[7] The court finds the testimony of Thomas to be entirely credible and determines as a finding that Thomas told Agent Seagraves that the notes were made for discussions he had with his attorneys and that he claimed them to be privileged.

6. There were material differences between the testimony of agents Seagraves and Brua at the hearing before Magistrate Judge Alba as to what was said by Thomas about the yellow notepad and its contents. According to SSA Brua, he and SSA Seagraves did discuss Thomas' claim that the notepad constituted privileged attorney client information, and that he was represented by legal counsel.[8] Agent Brua was well aware of this because he was in charge of executing the search warrant on the premises of Thomas in February. That testimony was not changed in any way at the April 15, 1996 hearing.

The court finds that the Customs agents knew that Thomas claimed confidentiality and attorney client privilege as to the notepad. They knew that the perceived incriminating handwritten notes and statements in the notepad had been the subject of private discussions with Thomas' attorneys. They further knew and believed that at least portions of the notepad did constitute privileged communications, and discussed the possibility that a court might so rule at some future hearing. Nevertheless, the agents discussed the contents of the yellow pad and determined that it should be seized because of the incriminating information contained in it. The court finds that thereafter, SSA Seagraves intentionally seized the notepad with knowledge that he was likely invading the attorney client privilege by so doing. No copy of the notepad was provided to defendant Thomas and it was not returned until October 1994 after the court on September 7, 1994 had ordered return of the notepad, all copies thereof, and the other documents.

7. Copies of the yellow notepad were made by Agent Seagraves, and copies of the other documents which had been reviewed were also made. Agent Seagraves and other U.S. Customs agents had access to the original yellow notepad from March 29, 1991, until the notepad, a copy of the notepad and copies

---

7. The fact that such meetings were held was verified by counsel for defendants who testified at the hearing before Magistrate Judge Alba on February 22–23, 1994. Billing records were produced to show the dates of the meetings in late February 1991.

8. SSA Brua testified at the hearing before Judge Alba that his recollection of the conversation

with Seagraves was that the yellow notepad contained "mixed information, some of which may have been attorney client and some of which appeared not to have been attorney client.... So my impression would have been to seize it and sort it out later.... I'm sure I would have requested [that he seize it] ..." Tr. 55, 56.

of other documents were sealed at the direction of Assistant U.S. Attorney Wayne Dance after demand for return of the notepad had been made by counsel for defendant Thomas on or about April 9, 1991. Those items were included in the sealed envelope sent to the custody of Special Senior Agent Brua in Salt Lake City, who was in charge of the customs investigation in Salt Lake City.

8. The sealed envelope containing the original yellow notepad and other copies of documents was placed in the custody of SSA Brua in Salt Lake City. He maintained custody until he retired in September 1991, at which time Agent Grossman as successor agent in charge of the investigation assumed custody. The sealed packet later was delivered by Agent Grossman to AUSA Dance, who submitted it to Magistrate Judge Alba for *in camera* review prior to the evidentiary hearing in Salt Lake City on February 22–23, 1994. Magistrate Judge Alba found the notepad to have been seized illegally, and the notepad and all other documents were ordered to be returned to defendants by Judge Benson on September 7, 1994. Thereafter, the sealed envelope and all documents contained therein were released to counsel for defendants on October 25, 1994.

9. SSA Seagraves prepared a report listing the documents of defendants, including the yellow notepad, which were examined and copied by him at the Portland International Airport on March 29, 1991. The report of Agent Seagraves was faxed by him to SSA Dale Brua in Salt Lake City on April 18, 1991, with the notation: "Sorry so late." The report listed the documents following this statement: "The yellow notebook and the copies made by SA Seagraves are listed below and were forwarded to SSA Dale Brua of the SAC/Salt Lake Office." The conclud-

ing statement on the report was: "The RAC/Portland investigation of Thomas is concluded."

10. Contrary to this "misleading report" of Agent Seagraves,[9] an additional full copy of the yellow notepad, as well as copies of the other documents, were not sealed. Rather, these items were placed in an unmarked and unnumbered file. This file was in existence and available to agents of the U.S. Customs at all times prior to delivery of that file to this court on March 14, 1996. The clear inference from the yellow sticker attached to the file, in the handwriting of SSA Seagraves to SSA Grossman, was that it was being made available or delivered to Grossman for use in connection with the customs prosecution of defendants. The sticker note said: "Dennis, There is *no* Portland case on this guy (SLC) he's all yours".

11. It was common knowledge of the five or six agents in the Salt Lake City Customs Office, including Agent Grossman, that the personal notes of defendant Thomas set forth in the yellow notepad were claimed to be privileged communications containing incriminating statements and materials relating to undervalued merchandise and defenses asserted by defendants. Agent Brua admitted that at least portions of the yellow pad had been read to him and that he may have discussed the matters with other agents.[10]

12. From time to time after his retirement in September 1991, retired agent Dale Brua talked to his successor, Agent Grossman, about the yellow notepad. After Grossman assumed primary responsibility for the Lin Lyn—Thomas case, retired Agent Brua called and asked Agent Grossman about the status of the notepad and whether there had been a court ruling concerning attorney

---

**9.** AUSA Dance so characterized the report at oral argument on March 29, 1996.

**10.** Q So did you tell other people in your office about the seizure?
A It like would have been common knowledge.... We're in a small 6 man office. We know what each other is working on generally....
Q So if it became common knowledge in the office that means that either you or your supervisor told all the other agents in the 6 man office, right?

A Things are just overheard within a small office. You don't have to get together and hold a meeting to have things known....
Q Where did you get the statement it was common knowledge? Explain why you said that?
A I wasn't secretive within my office with regard to the conversation that I had and I discussed it with Larry and I know, someone else could have been present in the room, another agent at the time we discussed it, in the hallway. (Tr. at 181–183, Hearing of 3/15/96)

client privilege.[11] The court finds that whatever information Agent Brua had about the notepad contents was shared with Agent Grossman, which included verbatim reading of portions thereof by Agent Seagraves to Agent Brua.

Agent Grossman talked with Agent Seagraves about the yellow pad in connection with preparation of an affidavit about it by Seagraves to be used and which was used in connection with the hearing before Magistrate Judge Alba. From the totality of circumstances, the court finds that it is more likely than not that Agent Grossman had full discussion with Agent Seagraves about the contents of the yellow pad.

13. On April 4, 1991, before the yellow notepad was sealed, RAC Agent Tuckerman refused a request by defendants' broker-agent to return documents of defendants obtained in the customs seizure on January 30, 1991. The reason given was the need to study "new evidence" which had been received. The government presented no evidence at the hearing to negate the inference that the "new evidence" constituted the items examined March 29, 1991, only about one week previous.

14. The court finds that agents of the U.S. Customs Service utilized information contained in the yellow notepad in furtherance of the customs investigation after March 29, 1991. Agents Brua and Grossman testified that information set forth in the yellow notepad was used as a lead to check out the assertions about "undervalued" radios contained in the notepad as well as the existence of a missing file. Later, persons whose names were set forth in the yellow notepad were interviewed in the Orient, and suppliers referred to in the yellow pad were contacted by Customs agents.

15. The court finds that the customs investigation was inextricably connected with information contained in the yellow notepad and that the interviews and evidence obtained thereafter relating to such matters was tainted "fruit from a poisonous tree" as flowing from the illegally seized notepad. References in the yellow notepad constituted leads which were followed, investigated and became pervasively and inextricably connected with the prosecution of this case.

Matters referenced in the notepad correspond with many of the charges in the Indictment. In this regard, the names of two companies, Saigo and Amtrek, prominently appear in the illegally seized yellow notepad under the heading "Improper/false lace declarations." Amtrek and Saigo are repeatedly referred to in the Indictment, and all of the counts relating to the alleged unlawful entry of goods into the United States that are based on false statements made by defendants involved contacts with Amtrek or Saigo. In addition to Amtrek and Saigo, several other companies exported goods from the orient through Lin Lyn Trading, Ltd. and Raymond Lynn Thomas, but only Saigo and Amtrek are named in the Indictment. Moreover, there is apparent correlation between shipments detailed in the yellow notepad and shipments that appear in the Indictment. Counts 8–17 have to do with the same shipping dates found in the yellow notepad.

16. The report of SSA Seagraves, transmitted to the Salt Lake City office on April 18, 1991, indicated that the investigation in Portland had been concluded. It is thus clear that no ongoing investigation of defendants in Portland was being conducted after April 1991. Although Agent Grossman testified that the unmarked and unnumbered file which he "found" in Portland came into his possession only after he was transferred

---

**11.** Q Do you recall discussing with Agent Grossman the note pad, you remember doing that? . . .
A I come off with a immediate yes but—
Q So you think you did discuss it with him at sometime?
A I believe so during the course of proceedings here and what not.
Q Did you discuss it with him in connection with these proceedings or don't you remember?
A Well all I can say is I would have to have if I

ever discussed the case with him, I think in relation to office or something. I know I went to the office, I know I discussed the case with him, how is the case coming; after I retired I come up for lunch and— . . . I do know I asked what would be the status of that pad, I know that I did. I can't tell you what date it would have been but that was the pending thing when I left so I know I would have asked him about it. (Tr. at 196, Hearing of 3/15/96.)

there in November 1993, the court finds that it is more likely than not that Agent Grossman had access to that file and/or learned of its contents and made use of it during the course of his investigation of this case.

17. In September 1993, Agent Grossman was assisting AUSA Dance in connection with the presentation of matters to a federal Grand Jury concerning defendants. At about the same time, counsel for defendants had filed a motion in court for return of the yellow notepad and other documents. Agent Grossman was aware that in August 1993 counsel for defendants had filed such a motion for return of the notepad claiming again and formally that it had been illegally seized. An affidavit to that effect by defendant Thomas had been filed in court. Agent Grossman reviewed that affidavit and discussed it with AUSA Dance who asked Grossman to contact Seagraves for an affidavit concerning the matter.

18. Agent Grossman talked to Seagraves on September 21, 1993, when Seagraves was at a motel on vacation in Southern California. Since the contact with Seagraves was at the same time the federal Grand Jury was investigating the Lin Lyn case, and the name of Seagraves and his telephone and room number was noted by Agent Grossman in his notes relative to certain Grand Jury witnesses, the court finds that it is more likely than not that the agents discussed the imminent prosecution and materials kept in the unmarked file relating to the Lin Lyn case. Agent Grossman admitted that Seagraves told him at that time that the yellow notepad contained notes about defenses of Lin Lyn.

19. Agent Grossman facilitated preparation of an affidavit by Agent Seagraves about the yellow notepad for use in connection with a hearing which was to be scheduled before Magistrate Judge Alba concerning the legality of the seizure under the claim of invasion of attorney client privilege.[12] The affidavit of Agent Seagraves was executed on October 6, 1993, before Agent Grossman was transferred from Salt Lake City to Portland.[13] The affidavit was utilized in court at the evidentiary hearing before Magistrate Judge Alba on February 22–23, 1994.

20. The government failed to carry the burden of proof to negate the presumption that the illegal possession of the notepad and knowledge of its contents provided government agents with leads which assisted in and became the basis for the charges set forth in the Indictment.

21. The government did not present evidence to overcome the following inferences which arose from the evidence before the court:

a. That having seized the yellow notepad, its contents were read, discussed and leads set forth therein were checked out and investigated by government agents.

b. That having purportedly placed in a sealed envelope the yellow notepad and all copies thereof at the direction of AUSA Dance, retention of a copy thereof in an

---

**12.** On September 21, 1993, Agent Grossman faxed 12 pages of materials to be reviewed by Seagraves: "Per our conversation—Lin Lyn—Thomas." On October 1, 1993, AUSA Dance faxed directly to Seagraves the following:

> Keith—Please include in your affidavit this or similar: In preparing this affidavit, I have reviewed and incorporated herein considerable information from my report of investigation, consisting of three typewritten pages, concerning my encounter with Raymond Lynn Thomas at the Portland International Airport on March 29, 1991. The report was prepared by me soon thereafter.

**13.** Agent Seagraves swore in his affidavit concerning the notepad:

> In addition to the business records, invoices, sales memos, etc., I scanned a yellow notebook with handwriting on the pages. I specifically remember that I saw obvious, overt evidence of illegal importations by Mr. Thomas in the yellow notebook. I remember that I saw the word "undervalued" by specific merchandise. Paragraph 16 reflects my independent recollection prior to recently reading my report or any other document or conversation regarding the events on March 29, 1991. I know that on at least one (1) of the pages I saw the word "undervalued" with a list of items under that word. One of the items listed as undervalued was "radios". I also saw the words "false declarations" and "not easily traceable". (Affidavit of Agent Seagraves, Oct. 6, 1993.)

This underscores the significance which the government agents had placed upon the notepad and Agent Grossman's knowledge as to the importance and prominence of that particular document.

unmarked file was purposefully done in order to use and follow up all leads contained therein concerning alleged customs violations.

c. That common knowledge in the Salt Lake City office of the seizure of the yellow notepad included knowledge of its contents.

d. That the yellow sticker attached to the file of documents which purported to relate to a person under investigation by the Salt Lake City office evidenced accessibility of that file to Agent Grossman at a time that he was in a position to investigate the matter.

e. That in the absence of some improper motive, upon noting the unusual fact that a file relating to a Salt Lake City person under investigation was being maintained in Portland, Agent Grossman would have opened it and taken note of its contents and returned the file to the Salt Lake City office and/or called agents in Salt Lake City about it.

f. That the actions of a Magistrate Judge and a United States District Judge in ruling that the seizure of the yellow notepad was illegal and that all copies had been ordered to be returned to counsel for defendants constituted common knowledge which was known by agents who were to be involved in the criminal prosecution and agents who were probable witnesses at trial.

g. That continued possession of the unmarked and unnumbered file and its contents and failure to return its contents constituted purposeful violation of a court order.

22. The government could have called Agent Seagraves who doubtless has knowledge of the circumstances relating to the unmarked file which contained a full copy of the yellow notepad and other documents copied at the Portland airport on March 29, 1991. Agent Seagraves presumably created that file, surreptitiously placed copies therein, wrote a misleading report to the effect that all copies had been sealed and wrote a note of transmittal to Agent Grossman. Presumably Agent Seagraves used or facilitated the use by others of the yellow notepad and its contents. The government failed to present evidence sufficient to negate that inference.

23. The government could have called others who may or may not have knowledge about the mysteriously produced unmarked file and use of information contained in the yellow notepad. Special Agent Tuckerman was evaluating "new evidence" in April 1991, presumably the evidence derived from documents seized or copied on March 29, 1991. Special Agent McCune who succeeded Agent Grossman as the agent in charge of the case in Salt Lake City after Grossman was transferred to Portland in November 1993, had been scheduled to testify but was not called. RAC Agent Larry Burnett who was in charge of the Salt Lake City office and who discussed the yellow pad with Agent Brua would have had access to whatever "common knowledge" there was concerning the seized notepad and its contents. None of these persons were called by the government to even deny knowledge of the existence of the unmarked file.

24. The court finds that the testimony of Agent Grossman concerning his discovery of the unmarked file, his failure to even open it up for over two years and his claimed unawareness of its relationship to the Lin Lyn Thomas investigation constituted testimony that was not credible. Agent Grossman's failure to observe or note that the file related to a Salt Lake City investigation even though a sticker on the outside of the file plainly referred to "SLC," and his failure upon finally opening the file to note the existence within it of a copy of the yellow pad even though a Customs Receipt in the file prominently indicated "Yellow Notebook" with pages attached, constituted willful blindness or intentional misleading. All of the aforesaid testimony is discounted by this court as lacking credibility.

### *ANALYSIS*

■ Where illegally seized evidence becomes known to government agents, a presumption is created that evidence obtained by the government as to such matters thereafter is tainted as "fruit of the poisonous tree." *See Nardone v. United States,* 308 U.S. 338, 341–43, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939); *Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 2508–09, 81 L.Ed.2d 377 (1984); *Segura v. United States,* 468 U.S. 796, 804–05, 104 S.Ct. 3380, 3385–86, 82

L.Ed.2d 599 (1984); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The government has the burden of proof to overcome that presumption. The Tenth Circuit recently has ruled that such taint comes about where there is improper intrusion into the Sixth Amendment right to a fair adversary proceeding by invasion of the attorney client relationship. In *Shillinger v. Haworth,* 70 F.3d 1132, 1142 (10th Cir.1995) the court said:

> ... intentional intrusion into the attorney-client relationship constitutes a direct interference with the Sixth Amendment rights of a defendant, and because a fair adversary proceeding is a fundamental right secured by the Sixth and Fourteenth Amendments, we believe that absent a countervailing state interest, such an intrusion must constitute a per se violation of the Sixth Amendment. In other words, we hold that when the state becomes privy to confidential communications because of its *purposeful intrusion into the attorney-client relationship and lacks a legitimate justification for doing so, a prejudicial effect on the reliability of the trial process must be presumed.* In adopting this rule, we conclude that no other standard can adequately deter this sort of misconduct. We also note that "[p]rejudice in these circumstances is so likely that case by case inquiry into prejudice is not worth the cost." (emphasis added)

▇▇▇ Under the Sixth Amendment, government agents have an affirmative obligation not to act in a manner that circumvents and thereby dilutes protection afforded by the right to counsel. *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). The Sixth Amendment is violated when government interferes with the relationship between a criminal defendant and his attorney and such interference substantially prejudices the criminal defendant. *Partington v. Gedan,* 961 F.2d 852 (9th Cir. 1992); *Rainer v. Department of Corrections,* 914 F.2d 1067 (8th Cir.1990) *cert. denied* 498 U.S. 1099, 111 S.Ct. 993, 112 L.Ed.2d 1077; (1991); *U.S. v. Kelly,* 790 F.2d 130 (D.C.Cir. 1986); *U.S. v. Irwin,* 612 F.2d 1182 (9th Cir.1980). *Greater Newburyport Clamshell Alliance v. Public Service Company of New Hampshire,* 838 F.2d 13 (1st Cir.1988). Prejudice is presumed when the accused is the victim of a "constitutional error ... and no amount of showing of want of prejudice would cure it." *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). The Third Circuit has adopted the rule that intentional intrusions into the attorney client relationship are per se violations of the Sixth Amendment. See *U.S. v. Costanzo,* 740 F.2d 251, 254 (3d Cir.1984), *cert. denied,* 472 U.S. 1017, 105 S.Ct. 3477, 87 L.Ed.2d 613 (1985); *U.S. v. Levy,* 577 F.2d 200, 210 (3d Cir.1978). In *Levy,* the court held that the only appropriate remedy for Sixth Amendment violation which occurred when law enforcement used an informer to obtain information concerning defense strategy, including attorney-client confidences, was dismissal of the indictment. In the case at bar, the intrusion into the attorney client relationship occurred early on and was intentional.

This court regards the intentional intrusion by government agents into defendants' privileged communications with their lawyers as pervasive and inextricably connected with the charges which were ultimately set forth in the Indictment in this case. The taint occurred so early in the investigation that it affected and tainted the entire subsequent investigation. Further inquiry into the matter would be ineffectual and not likely worth the cost of the inquiry. In this regard speaking of "interference with counsel's assistance," the Supreme Court in *Strickland v. Washington* said that "prejudice is presumed," and that "prejudice in these circumstances is so likely that case-by case inquiry into prejudice is not worth the cost." 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984). In this case prejudice is so likely that reliability of the trial process is compromised because of the purposeful intrusion into the attorney client relationship.

Based upon the foregoing, this court rules and holds that all evidence obtained by the government after the privileged notepad was illegally seized on March 29, 1991, was tainted and should be suppressed. The sanction of dismissal is the only practicable remedy under the circumstance of this case. Accordingly, the trial scheduled to commence on

May 20, 1996 is vacated, and the Indictment in this case is dismissed.

IT IS SO ORDERED.